THOMAS JACKSON, A CITIZEN OF THE STATE OF VIRGINIA, AND OTHERS, CITIZENS OF THAT STATE v. THE REVEREND WILLIAM E. ASHTON, A CITIZEN OF THE STATE OF PENNSYLVANIA.

The appellants filed a bill in the circuit court of Pennsylvania, claiming to have a bond and mortgage cancelled and delivered up to them. They alleged that the same was given without consideration; was induced by threats of a prosecution for a criminal offence against the husband of the mortgagor; and that the instruments were, therefore, void; and that they were obtained by the influence the mortgagee exercised over the mortgagor, he being a clergyman, and her religious visiter; and her mind being weak or impaired. The circuit court of Pennsylvania dismissed the bill; and on appeal to this Court the decree of the circuit court was affirmed.

A court of chancery will often refuse to enforce a contract, when it would also refuse to annul it. In such a case, the parties are left to their remedy at law.

No admissions in an answer to a bill in chancery can, under any circumstances, lay the foundation for relief under any specific head of equity; inless it be substantially set forth in the bill.

APPEAL from the circuit court of the United States for the Pennsylvania district.

The principal facts of the case, as stated in the opinion of the court, were as follow:—

The appellants, who are the devisees of Maria Goodwin, brought their bill to set aside a bond and mortgage executed by Maria Goodwin, and her trustee, Kenneth Jewell, to the defendant, on the 5th of January, 1829, to secure the payment of 3000 dollars. The bill represents that the mortgage was given without consideration; that shortly after the decease of Thomas Goodwin, the husband of Mrs. Goodwin, which took place in February, 1828, the defendant stated to her that he had a demand against her husband, to whom she had been much attached, and who had treated him extremely ill; that he had it in his power to render his memory odious, by exposing his conduct; but that he would conceal the transaction, if she would execute a mortgage to him on her own property, to secure the debt; that she refused to execute the mortgage, or give any other security, by the advice of her counsel; and afterwards avoided his visits to get clear of his importunities: that shortly after this Mrs. Goodwin was

taken ·ill, and being executrix, her husband's affairs pressed much upon her, and she fell into a l⸗w nervous state of spirits, which impaired her memory and affected her mind; that whilst she was in this state, the defendant renewed· his visits; and, professing great ·kindness for her, took upon himself the management of her business; and, having gained her confidence, prevailed upon her, in the ab-ꞏsence of any friend or legal adviser, to execute the mortgage, and a corresponding bond, and to direct that her trustee should join in the execution; the defendant, as a clergyman, saying she ought to do so: that these representations had great influence on Mrs. Goodwin, who was a woman of devout religious feelings.

The complainants further represent, that at the time the bond and mortgage were executed, Mrs. Goodwin was utterly incapable of understanding or comprehending their meaning and effect; that after the death of Mrs. Goodwin, the defendant stated to the complainants, that the mortgage was executed as collateral security for any sum that might be due to him from the estate of Thomas Goodwin, deceased.

ꞏ In his answer, the defendant admits the execution of the bond and mortgage, and states, that in eighteen hundred ·and twenty-two, being about to receive a sum of money, he consulted Thomas Goodwin, who was then a broker in Philadelphia, in what way he could most advantageously invest it. That Goodwin advised him to leave the ·money in his hands, and that he would loan it ꞏout on good security. That the defendant, in pursuance of this advice, placed three thousand four hundred dollars in his hands, and also loaned him two hundred and seventy-five dollars; and took his notes by way of acknowledgment.

That Goodwin received a bond and mortgage for twenty-six hundred dollars, in favour of defendant, from Samuel Jones, covering an estate which was under prior .mortgages for twenty-five hundred dollars, which, with the money of the defendant, Goodwin was to satisfy ; but that he paid but one thousand dollars of the amount, and fraudulently withheld the balance. And to cover this fraud, that he obtained from the recorder of deeds, copies of the prior mortgages on the estate of Jones, and at the foot of the certificate of the recorder, wrote himself " paid and satisfied ;" and then exhibited the papers to Jones and the defendant, to show that he had discharged the mortgages. ·And as there also remained on the estate a prior lien of a

[Jackson v. Ashton.]

judgment for seven hundred dollars, that Goodwin took a bond of indemnity from Jones against it.

That defendant often solicited Goodwin to deliver up to him the mortgage, which under various pretexts he declined doing, but assured the defendant that he had discharged the prior mortgages: at length the defendant becoming uneasy, he called at the recorder's office, and there found that the mortgage for fifteen hundred dollars had not been discharged; and that the endorsement upon it of "paid and satisfied," must have been made by Goodwin. On the same day that the defendant made this discovery, Goodwin informed him that he was about to stop payment; but he assured the defendant that he should not lose a cent.

Goodwin admitted to the defendant that he had used the money for his own purposes, instead of paying off the mortgage, and that he had deceived both the defendant and Jones. And at the same time, Goodwin placed a mortgage in the hands of the defendant for twenty-five hundred and seventy-five dollars, to secure him against the mortgage on the property of Jones, which should have been discharged. That Goodwin assured him the property mortgaged was unincumbered, which was untrue; and the defendant reproached Goodwin with having again deceived him, and threatened him with an exposure, unless he should make payment or give security. Goodwin replied, "what can you do? if you push me I will take the benefit of the insolvent law;" the defendant rejoined, "have you forgotten the certificate which you forged? My attorney informs me, that if Mr. Jones, or myself, shall come into court with that certificate, that you would be sentenced to hard labour." Goodwin became alarmed, and stated, that he would sell the property and make good the deficiency, if the defendant would not expose him.

This conversation took place in the presence of Mrs. Goodwin, who, when the defendant was leaving the house, accompanied him to the door, appealed to his friendship for her, entreated him not to expose the transaction, declared that she would not have it known, especially in the church, and among the congregation at Blockley, for any consideration whatever. She added, that Mr. Goodwin would sell the property, and make provision for the payment, and that she would make up the deficiency out of her separate estate; and that neither the defendant nor his child, whose deceased mother she greatly esteemed, should lose any thing.

A few days after this Mrs. Goodwin saw the certificate, and

acknowledged that it was in the hand-writing of her husband; and she again entreated the defendant not to expose him, and said she would pay him if her husband did not. This assurance was frequently repeated on various occasions, up to the death of Goodwin, which took place suddenly in February, 1828. At the moment of his death, Mrs. Goodwin sent for the defendant, desired him to superintend the interment, and she threw herself upon his kindness for consolation. After the interment, the defendant spent the evening with Mrs. Goodwin, engaged in religious conversation; and being about to leave, she said, Mr. Ashton, I hope you will not forsake me. If you cannot come in the day time, come in the evening, and pray with me. I will be pleased to see you at any time, and as soon as I get a little over my trouble, I will fulfil my promise and settle with you. The defendant replied, that he hoped she would not let his concern trouble her at that time; that it gave him not a moment's uneasiness.

This promise was repeated by Mrs. Goodwin again and again; and on one occasion, when the defendant was ill, she expressed uneasiness lest he might die before the matter was arranged. On consulting counsel, she was advised to do nothing with her property for a year, and he refused to draw a deed. But she said the advice was unjust, that she would pay the defendant, and felt herself bound to do so as a christian. And she delivered a covenant to the defendant, binding herself to make good the deficiency, should there be one on the sale of her husband's estate. Up to this time, the defendant had not expressed a desire to Mrs. Goodwin that she should pay any part of her husband's debt.

In December eighteen hundred and twenty-eight, the defendant stated to Mrs. Goodwin that she had acted voluntarily in the matter and not through his persuasion. That if he might be permitted, for the first time, to become active in the business, he would suggest, that as her property was held in trust, the covenant which she had executed to him was not valid. She expressed surprise, and a willingness to secure him ; and the bond and mortgage in controversy were prepared and executed at the office of Thomas Mitchell, a scrivener. An agreement was executed by the defendant, declaring that the bond and mortgage were given as collateral security, &c.

With the exception of the execution of the bond and mortgage, the defendant denied all the material allegations of the bill.

[Jackson v. Ashton.]

· The other facts are stated in the opinion of the Court; and by the counsel, in the argument.

The case was argued by Mr. Key, for the appellants; and by Mr. Ingersoll, for the appellee.

Mr. Key, for the appellants, contended:—

1. There was no consideration for the bond or mortgage.

2. That they were executed by a weak woman, who, at the time, was incapable of making such a contract.

3. That they were extorted by a threat to prosecute her husband.

4. That the relation in which the defendant stood to Mrs. Goodwin, as her pastor and religious visiter, and as agent and adviser in her affairs, prohibited any contract with her; especially when made in the absence of her counsel, and with his known disapprobation.

· Mr. Key, in opening the case, represented the contract which gave rise to this controversy as having a remarkable origin, and followed by very singular circumstances.

The origin, as exhibited by defendant in his answer, and the proofs, was this: he had been defrauded by Mr. Goodwin; the fraud, as defendant thought, was accompanied by forgery, and he goes to Goodwin, and finds him at his house, and in the presence of his wife charges him with the fraud, and threatens him with a prosecution for forgery: he says he has taken counsel, and that he has a paper, which he is advised, proves the forgery, and would send Goodwin to hard labour.

Goodwin is alarmed; begs him to keep the matter secret; and promises to pay or secure him.

On leaving the room, Mrs. Goodwin follows him: the defendant was a clergyman, Mrs. Goodwin was a pious woman, of the same church, and had been a communicant in defendant's congregation. She begs the defendant "not to expose the transaction," saying "she would not have it known, especially in the church and among the congregation at Blockley, for any consideration whatever:" and she added, that Mr. Goodwin would sell the property and pay it, and "she would make up the deficiency out of her separate estate." After a few days she called on defendant, and asked to see the certificate, which defendant had charged to be a forgery: it was shown to her, and she observed "it was her husband's hand-writing; and again entreated the defendant not to expose it, and said that she would pay

Vol. XI.—2 G

him if her husband did not:".this was in 1824: Goodwin died suddenly in February, 1828. The answer says, "the defendant continued to rest upon the assurances which had been so often given to him, by both the husband and wife; and especially upon the good faith of the latter, in which he placed great reliance after the repeated solemn voluntary promises which she had made to him; which he believed she had both the inclination and ability to make good."

At the death of her husband, Mrs. Goodwin "sent for defendant," "asked his friendly assistance, and threw herself upon him for consolation; and the defendant passed the evening at her house in religious conversation." He continued to visit her till he was taken sick. She then went to see him, and on her second visit said, "she came to fulfil her promise by offering him further security; that she would deed him the house in Lombard street, to hold as collateral security till Mr. Goodwin's property was sold:" the defendant expressed himself satisfied with whatever she thought right. Goodwin (it should be observed) in his life time, had given the defendant some property as security; and the defendant himself, as he himself stated, only thought himself unsecured to the amount of 500 or 600 dollars. The conversation ended by her assuring the defendant, that "she would call on Mr. Ingraham, her attorney, to draw the deed, and bring it as soon as it was ready."_ A few days afterwards she called again, and said "she had called on Mr. Ingraham agreeably to her promise, but he refused to draw the deed; stating it would be wrong for her to pay any of her husband's debts; and that she must do nothing with her property any way for a year." "She added, that the advice of Mr. Ingraham was very unjust, that it did not move her in the least from her intention to pay all Mr. Goodwin's friends to whom he was indebted, and that she felt bound in conscience as a christian to do so." She therefore delivered to the defendant a covenant, whereby she agreed to make good the deficiency, should there be one after the sale of her husband's property, in the payment of the defendant's claim of 2,575 dollars, with the interest due thereon. This covenant bears date July 17th, 1828.

After this, the answer stated, about the 31st of December, 1828, the defendant informed her this covenant did not bind her property, as it was held by trustees. She expressed her surprise, and said she had executed a mortgage to the Bank, and " would execute a similar one in favour of the defendant." " A mortgage was accordingly prepared and executed by herself and Kenneth Jewell, her trustee,

[Jackson v. Ashton.]

with a bond conditioned to pay 3,000 dollars to defendant, and a warrant of attorney to confess judgment; all dated on the 5th of January, 1829. A defeazance was drawn at the same time, to be signed by defendant; showing the true consideration of the mortgage was not the bond, but to pay the deficiency of defendant's debt from Thomas Goodwin, after applying the proceeds of Goodwin's property to that object. This defeazance was never, in point of fact, delivered to Mrs. Goodwin or her trustee. The scrivener did not know when it was executed. Defendant was to come back and execute it; it was then to be sent to Kenneth Jewell by the scrivener. This never was done; and there was never any other delivery of it than leaving it with the scrivener, when it was signed. Nor was it ever afterwards produced till after this suit was brought, when it was produced by defendant, who was said to have borrowed it. It appears, by the evidence of B. G. Mitchell, that neither he, nor his father, nor the defendant, about a year before the suit was brought, knew where it was; and that it was then said defendant had borrowed it. The mortgage is not only for the house in Lombard street, but for two others; and, as far as the case shows, for all her property. This is the bond and mortgage, which the defendant now asserts the right to establish; in opposition to the bill filed in the court below, by the representatives of Mrs. Goodwin, to set them aside as made without consideration; as being obtained from a weak woman " utterly incapable at the time of execution, from her state of health and mind, of understanding or comprehending the meaning of the same;" and, in favour of a person " who having gained her confidence, prevailed upon her, in the absence of any friend or legal adviser, to execute to him the said bond and mortgage, and to direct her trustee to join in the execution, representing to her, as a clergyman, that she ought to do so : which said representation, she being of a devout disposition and religious inclination of mind, had in her then state of health and mind great influence upon her." He contended, that from the bill, answer and proof, it appeared,

1st. That there was no consideration, or an illegal consideration for this bond and mortgage.

The answer represented the covenant of July as the consideration for the bond and mortgage; and the previous parol promise of Mrs. Goodwin, in the life of her husband, as the consideration for the covenant. But if that previous parol promise was without consideration, (as it clearly was,) then the giving the covenant, and, subsequently,

the mortgage, under the influence of the previous promise, and the impression that it was obligatory, is no confirmation. Under this head, he cited 3 Bos. and Pul. 249; 7 Cowen, 57; 2 Bro. Ch. Rep. 400; 3 Bro. C. R. 117; 2 Vern. 121.

He further contended, under this proposition, that an illegal consideration appeared, and was, of itself, alone, conclusive against the validity of the contract; the original consideration, which tainted all the subsequent contracts, was the suppression of a prosecution. This is shown by the answer and by the testimony of Dodge; who states that the defendant told him " the consideration related to unfair conduct—the forging of a certificate from the recorder's office; and he was to let the matter rest, and not to prosecute, if she would pay."

In the defendant's proof, a similar statement is shown to have been made by Mrs. Goodwin.

That such a consideration vitiated the contract, he cited Brooke v. Marbury, 7 Wheat. 575; 3 P. Wms. 279; Powell on Contracts, 354, 5, 6.

It is said there was here no forgery in fact; and that therefore, there could be no prosecution. Powell on Contracts, 356, shows that if there was any colour for the charge, it is enough: that it is not necessary the crime should appear to have been committed.

And if, again, it is said that complainants are not entitled to relief, if compounding the felony was the consideration, being in pari delicto; he answered that that principle, and all the cases cited in support of it, only applied where the party himself who had assented to the contract, came to a court of equity for relief: the representatives of such a party, were not in pari delicto, and not liable to the objection; this distinction was taken, and relief allowed to the representatives in Matthew and Hanbury, 2 Vern. 187; and the same case also answers the objection, that the bill does not change the illegal consideration, or the fraud; 9 Pick. R. 212; 3 Cow. 538.

If, then, there was nothing more in the case, this illegal consideration being fully proved by the defendant himself in his own evidence, and admitted by his own statement of the consideration to Mr. Dodge; vitiates these securities.

2d. He next contended, that these instruments were obtained from a weak woman, incapable at the time of making such a contract; and artfully extorted from her by exciting her fears for her husband.

He compared the testimony of complainants and defendant as to her state of mind and body, when these contracts were made; and

[Jackson v. Ashton.]

contended, that the weight of evidence was against her competency: the contracts she did make at that time, were all made with the approbation of her legal advisers; and three of these witnesses say they would not have made a contract with her otherwise.

Further, the complainants'. witnesses are her intimate acquaintances, and on most familiar and confidential terms of intimacy; and those of the defendant had but a slight acquaintance with her.

The defendant, on the contrary, is shown by all these transactions to have been a shrewd man.

He gets security for 3000 dollars, to save him from a probable loss of 500 or 600 dollars; is to give a defeasance, which she never gets; which he borrows, and nobody knows where it is, till its production is necessary for him.

She offers one house, he gets three; and apparently all the property she had.

He does not move in the business during her husband's life, because he feared he would not have suffered his wife to be so imposed on. When she complains of the transaction, he quiets her by promising to wait for his money till after her death. And above all, by his art in making his threat of prosecution in her presence, knowing her affection for her husband would prompt her by securing him, to prevent the prosecution.

Such a contract, he contended, could not be sustained between any persons : but here:

3. The relation subsisting between the parties, the defendant being her pastor and religious visiter; on whom, as he himself states, " she had thrown herself for consolation;" and being, further, her agent and adviser, in attending to her property and managing her affairs, as the proof shows; gives to the contract a character which a court of equity, on principles of public policy, must condemn. The relation being proved, the presumption of the undue and irresistible influence of such a relation is enough for the complainants.

Under this head he cited, 12 Ves. 371, in which the Lord Chancellor says, " without any consideration of fraud, or looking beyond the relation of the parties, the contract is void." Also 2 Jacob and Walk. 413; where the absence of the legal adviser in a bargain made between such parties, is considered an objection.

Here there was not only the absence of the legal adviser, but his decided advice against the contract, and his refusal to assist in it; and

that advice and refusal known to the defendant.　Cited 2 Scho. and Lefroy, 31; 3 P. Wms. 130; Milne and Keene, 271; 14 Vesey, 273; 3 Mad. Griffith and Robins, 105; 1 Ves. 503; 1 Cox, 112; 1 Hov. 146; 8 Price, 161; 16 Ves. 107; 2 Eden, 290; 5 Pothier, 572, 432; 1 Jon. Ch. R. 350.

The defendant has thought himself safe, because he presumed the complainants could not prove that he used the influence this relation gave him in gaining his object.　But these cases show that the complainants need not prove it.　The whole burden of proof is on him.　He must show, that it was a fair and reasonable contract, for a woman in distressed circumstances to make; that she made it with full knowledge, and freely, and with the advice of competent friends or counsel.

He has shown nothing of this.　It was most unreasonable to strip herself of her property, for no benefit.　She was most cruelly tortured; and her fears, not her free will, gave the promise; and she had the approbation of no friends, for she did not consult her trustee, who disapproved of it; and if consulted either by her or the defendant, would have prevented it: and her counsel had refused to draw the instrument, and the defendant knew of his refusal.　It is to be hoped that the high sanction of this Court will never be given to such a contract; which is a temptation thrown in the way of the ministers of religion, which they may not always be able to resist. This most important and solemn relation that can subsist between individuals, ought, above all others, to be guarded, even from the possibility of abuse; and hallowed by the most exalted purity.

Mr. Ingersoll for the defendant.

The case of the appellee, as it stands without dispute or contrariety of testimony, exhibits strong claims for the consideration of a court of equity.　A gentleman was defrauded of a considerable sum of money in the course of arrangements for a mere investment, from which he could not possibly have gained a farthing; and could not, in the ordinary and even cautious estimate of results, have anticipated a loss.　The broker in whose hands he regularly places his funds in mere and necessary deposite, fails to procure the promised security; and the funds are dishonestly withdrawn from the use of their lawful owner.　This state of things continues unchanged, during the joint lives of the parties to the transaction.　One of them is a perfectly

fair and honest sufferer; without being subject to the slightest impu-
tation of misconduct or even indiscretion. The other is a gainer
precisely to the extent of the impropriety of his conduct; and lives
and dies in the enjoyment of his ill-gotten gains.

After the death of the fraudulent party, his wife executes an in-
strument, calculated merely to indemnify the party wronged. In
doing so, she interferes with no just demand upon herself or her
buried husband. She deprives no creditor of his claim. She does
not even take from child or relative, a portion needed for education
or support. She does an act which comes as near to the perform-
ance of an absolute duty, and a compliance with the exactions of po-
sitive right, as can be conceived; without a positive provision for it in
the municipal code. It is an act which, in effect, some systems of
legislation have enjoined; which in the code of morals comes within
a cardinal regulation; and which, in practice, is an honourable and
not an unfrequent exhibition. Montesquieu highly commends a law
of Geneva, which denies to the children of an insolvent parent the
enjoyment of office, until they have paid his debts.

Mrs. Goodwin herself did the like with other creditors of her
husband, without any complaint on the part of her devisees.

The case thus presented, is one of those correct and even laudable
transactions to which popular sentiment does homage, as to a useful
example: and to which courts of justice will lend their aid as directly
within the just promotion of the purposes of all law, the good con-
duct and the happiness of those who live under it.

The complainants must go far out of the case in order to succeed.
They must show something stronger than a contract, to destroy such
an arrangement, as is stated to exist. It is within the limits of
legal possibility to do so. A contract, however clearly made, is lia-
ble to be overturned, if it be found wanting in the necessary legal in-
gredients which must contribute to sustain it.

The complainants assume this burthen of disproof. Fraud will
vitiate any contract, unless it be mutual fraud. The pleadings neither
allege the existence of fraud, nor the existence of the relation of pas-
tor and member of a flock, from which it is argued that influence
was fraudulently exercised. Such allegation is required, according
to the best authorities. Flint v. Field, 2 Anstruther, 543; Gordon
v. Gordon, 3 Swanston, 472; Gouverneur v. Elmendorf, 5 Johns.
ch. 79; E. I. Company v. Henchman, 1 Ves. jr. 289; Handy v.
Handy, 11 Wheat. 103.

[Jackson v. Ashton.]

This want of allegation is relied upon no further than to the extent of its preventing a suitable denial in the answer; and thus exposing the case to the uncertainties which arise from conflicting assertions in argument. Every allegation in the bill, which is material, is denied; and not one is sustained by testimony, to the disproof of the assertions in the answer. The bill relies upon the following positions; all of which are denied.

1. That the complainant, Jackson, in the summer of 1819, *discovered* the mortgage recorded, and called on the defendant to know how the debt was contracted, &c.

2. That the defendant urged Mrs. Goodwin, shortly after her husband's death, to execute a mortgage.

3. That she *refused* to do so; and that such refusal was by the advice of counsel.

4. That to avoid his importunities, she refused to receive his visits, or to see him.

5. That in December, 1828, (before the mortgage was executed,) she was taken ill.

6. That after her being taken ill, in December, defendant renewed his visits; took upon himself the management of her affairs; and having gained her confidence, and represented to her, as a clergyman, that she ought to execute the mortgage, prevailed on her to do so in the absence of any friend or legal adviser.

7. That she was utterly incapable of " understanding or comprehending" the meaning of the mortgage.

These assertions are made by one who does not pretend to know the truth of them, or to assert any thing of his own knowledge. He is irresponsible, because he is uninformed. They are unfounded in proof. They are all contradicted by the answer, in terms which are unmeasured and unequivocal. They are all, as far as negative proofs can go, contradicted by other testimony. They remain, therefore, assertions, only; ineffective words.

We deny that any relationship subsisted, which justifies the imputation of undue influence. Mr. Ashton was a clergyman, and Mrs. Goodman was a religious woman; that is all that *existed*, and it is all that is *alleged*. There are relations which induce a high degree of confidence on the one side, and influence upon the other. They are stated in 1 Story's Equity, 306, &c. Wherever they exist, all arrangements between the parties are narrowly observed. It is equally true as to, *quasi*, guardians or confidential advisers. But neither these,

nor the positive relations between trustee and cestui que trust, vitiate necessarily a contract. A man cannot buy of, or sell to *himself,* if he stands in the double capacity: but a trustee may, and often does purchase of his *cestui que trust.* Coles v. Trecothick, 9 Ves. 246; cites Fox v. Mackreth, 2 Br. C. C. 400; Morsen v. Royal, 12 Ves. 355; Whichcote v. Lawrence, 8 Ves. 740; Lessee of Lazarus v. Bryson, 3 Binney, 63; Wormley v. Wormley, 8 Wheat. 471.

The doctrine of the complainants, would vitiate every contract between a pastor and the members of his congregation. He would become *civiliter mortuus,* and perhaps starve. No gift can be accepted, no purchase made from those who are about him; and the consequence would be, a condition of absolute seclusion and non-intercourse with his fellow-men.

The charge of imbecility of mind, is positively denied. It is denied in all its stages and degrees. It is repelled throughout. Mrs. Goodwin was not only not a woman " utterly incapable of understanding and comprehending what she did;" but she was a woman of strong, active, vigorous, and acute intellect. The idea of insanity is more than absurd; although it is suggested by one, at least, of the witnesses for the complainants. The act itself, conducted with infinite prudence and care in all its stages, proves her strength of mind and firmness of purpose. It was a fortnight or three weeks in progress. It was conducted with great correctness and propriety ; with no undue haste, and no sort of surprise or irregularity. Much importance is always attached to the manner of conducting the very thing which is sought to be avoided by reason of alleged imbecility of mind. Cartwright v. Cartwright, 1 Ecc. Rep. 51. During her lifetime, not a suggestion was made of the invalidity of the act, or her incapacity to perform it. The complainant himself, her agent in business, as well as her successor in interest, and guardian by affinity, knew of the mortgage, and of the determination of the defendant to pursue it; of his refusal to compromise; and of his stern demand of the uttermost farthing as a clear right. Yet he permits it to pass. So does she. She does more. She confirms it, in the belief which has been verified, that it would not be enforced during her life. All this omission to object in due and proper season, was the result of a conviction, that the presence of Mrs. Goodwin would have put down, at once, an attempt to avoid the mortgage. She never denied or doubted it. Her whole life was its confirmation; and she would

have revolted indignantly at the thought of an inconsistent attempt to disaffirm it. There is no difficulty about stultifying one self, if there be the slightest imposition. See 12 Petersdorff, 277, 8.

Witnesses are called to prove an illness, at a period subsequent to that alleged, and subsequent also to the date of the mortgage. Such evidence is not available, being counter to the party's own allegation in pleading. E. I. Co. v. Keighly, 4 Mad. 16; Polling v. Armitage, 12 Ves. 78; Willis v. Evans, 2 Baud B. 228; Underhill v. Van-Courtland, 2 Johns. Ch. Rep. 339; James v. M'Kennon, 6 Johns. Rep. 543, 559; Linker v. Smith, 4 Wash. C. C. Rep. 224.

The cases of influence reported in the books, show direct misrepresentation, and wilful fraud. Slocum v. Marshall, 2 Wash. C. C. Rep. 397; Whelen v. Whelen, 3 Cowen, 537; Huguenin v. Baseley, 14 Ves. 273; Norton v. Relley, 2 Eden, 286; Pusell v. Macnamara, 14 Ves. 91.

It has been argued by counsel, although not suggested in the pleadings, that the mortgage is void; because in furtherance of an attempt to compound a prosecution for a crime. We deny that any such arrangement was at any time made. The cases which have been decided on the subject of agreements, contrary to the policy of the law, do not apply to this. Leading ones are to be found, 2 Wils. 341; 1 Leon. 180; 3 P. Wms. 279; 1 Hopk. 11, &c.

But the rule is, that if an arrangement may be lawful, no principle directs that it shall be construed otherwise; Harris v. Busk, 5 Taunt. 54; Shunk v. Mingle, 13 Serg. & Rawle, 29; Wallace v. Hardacre, 1 Camp. 45; Brett v. Close, 16 East, 298.

No forgery in fact had been committed. There was a gross fraud; and Mrs. Goodwin anxiously desired that it should not be made public. That end was gained by the forbearance to sue during her husband's life. After his death the fears of a prosecution were over. There was none to be dreaded, and none to be stifled. All that she did was purely voluntary. If she made any engagements before, (she being a married woman,) they were legally non entities. 1 Sid. 120; 7 Mass. Rep. 14.

Were it otherwise, the case of the complainant would not be aided. A mutual agreement to violate the law, will not justify the application of either party to a court of justice for relief. This is not our attempt to enforce the mortgage. It is the attempt of the complainants to have it delivered up to be cancelled. If their views are cor-

[Jackson v. Ashton.]

rect as to the nature of the contract, neither party can succeed. The distinction between an application for specific performance, and a bill like this, is well understood. Smyth v. Smyth, 2 Mad. 387; Martin v. Mitchell, 2 Jacob & Walker, 419.

The law, however administered in point of form, does not lend its aid to those who allege that they have endeavoured to violate it. Hawes v. Louder, Yelverton, 196; Osborne v. Moss, 7 Johns. 161; Simmes' Lessee v. Gibson, 1 Yeates, 291; Reichart v. Castator, 5 Binn. 109. Newman v. Cupp, 5 Binney, 76; 5 Co. R. 60; 2 Vern. 133.

We know nothing of the source from which the trust estate of Mrs. Goodwin was derived. If from her husband, it is a fund peculiarly appropriate for the payment of this debt; and it is fraud to withhold it. Inducements stronger even than those of honest pride and affection, may have led her to provide this security. Under the consciousness, if it existed, that she held property which belonged to her husband; it was the simple dictate of moral honesty, to yield it to so sacred a claim as that of the defendant. With or without the motive, she was sensible that the money of which the defendant had been spoiled, belonged to the child of a deceased friend; and she therefore anxiously and naturally sought to secure its restoration.

Much has been said of the extent of pecuniary effort which Mrs. Goodwin's estate must make, to meet this engagement. It is supposed that all her property was pledged for the purpose; and more than once, she is declared to have stripped and beggared herself, to meet the object. It is easy to show how erroneous is this presumption; and hence to defeat the argument drawn from the supposed unreasonable character of the sacrifice, and the appeal which it involves to our feelings of kindness for her descendants.

1. The mortgage contains only three small lots in the city of Philadelphia, and it is in evidence that she had property in the country; especially the seat where she was visited by Dr. Beatty, during one of her attacks of indisposition.

2. The bill states, that Mrs. Goodwin's will devises, *among other things*, the mortgaged premises. The general character of the will does not enable us to judge of the comparative value of the property mortgaged, and that which was left free from liability.

[Jackson v. Ashton.]

It is obvious that the mortgage affords inadequate security to the defendant.   The money loaned, and perhaps lost, is        $3675

The security given by Mrs. Goodwin, yielding beyond
other liens, 61 dollars a year, would afford a capital
of about        -        -        -        - -        -        1000

                                                    $2675

Mr. Ashton saved by the purchase of premises mortgaged by Goodwin, and levied on, and sold by virtue
of an earlier mortgage,        -        -        -        - -        496 92

Leaving a *principal* sum unsecured,   -        -        -        $2178 08

Something has been said with regard to the possession of the defeasance by the defendant.   It wanted explanation, in proof, before the circuit court.   But it is now fully explained by the testimony of Daniel R. Ashton; who states that it was borrowed of the scrivener for the purpose of preparing the answer.   It had remained in the hands of the scrivener, in consequence of the inadvertent omission of Mrs. Goodwin's trustee to call and receive it.   Besides, there is nothing in the bill in relation to it: if there had been, it would have enabled the defendant himself fully to account for whatever there is supposed to be of mystery.   It was executed in perfect good faith and form.   It was left with the scrivener according to agreement, and it was so left for the proper party, (the trustee,) and it remained subject to his call.   A failure of memory in the scrivener, who did not chance to recollect how it passed out of his hands; or a little neglect in the trustee to call for it in season; cannot surely involve a case in jeopardy, or a party in so grave a charge as that of withholding a document necessary for the protection of the complainants against absolute liability.   The defendant never alleged that the mortgage was other than collateral.

Mr. Justice M'LEAN delivered the opinion of the Court.

This suit in chancery is brought before this Court, by an appeal from the decree of the circuit court of Pennsylvania.

The appellants, who are the devisees of Maria Goodwin, brought their bill to set aside a bond and mortgage executed by Maria Goodwin, and her trustee, Kenneth Jewell, to the defendant, on the 5th

of January, 1829, to secure the payment of 3000 dollars.   The bill represents that the mortgage was given without consideration ; that shortly after the decease of Thomas Goodwin, the husband of Mrs. Goodwin, which took place in February, 1828, the defendant stated to her that he had a demand against her husband, to whom she had been much attached, and who had treated him extremely ill; that le had it in his power to render his memory odious, by exposing his conduct; but that he would conceal the transaction, if she would execute a mortgage to him on her own property, to secure the debt: that she refused to execute the mortgage, or give any other security, by the advice of her counsel; and afterwards avoided his visits to get clear of his importunities: that shortly after this Mrs. Goodwin was taken ill, and being executrix, her husband's affairs pressed much upon her, and she fell into a low nervous state of spirits which impaired her memory and affected her mind ; that whilst she was in this state, the defendant renewed his visits, and professing great kindness for her, took upon himself the management of her business; and, having gained her confidence, prevailed upon her, in the absence of any friend or legal adviser, to execute the mortgage, and a corresponding bond; and to direct that her trustee should join in the execution; the defendant, as a clergyman, saying she ought to do so: that these representations had great influence on Mrs. Goodwin, who was a woman of devout religious feelings.

The complainants further represent, that at the time the bond and mortgage were executed, Mrs. Goodwin was utterly incapable of understanding or comprehending their meaning and effect; that after the death of Mrs. Goodwin, the defendant stated to the complainants, that the mortgage was executed, as collateral security for any sum that might be due to him from the estate of Thomas Goodwin, deceased.

In his answer, the defendant admits the execution of the bond and mortgage, and states, that in 1822, being about to receive a sum of money, he consulted Thomas Goodwin, who was then a broker in Philadelphia, in what way he could most advantageously invest it ; that Goodwin advised him to leave the money in his hands, and that he would loan it out on good security.   That the defendant, in pursuance of this advice, placed 3400 dollars in his hands ; and also loaned him 275 dollars, and took his notes by way of acknowledgment.

That Goodwin received a bond and mortgage for 2600 dollars, in

favour of defendant, from Samuel Jones, covering an estate which was under prior mortgages, for 2500 dollars, which, with the money of the defendant, Goodwin was to satisfy; but that he paid but 1000 dollars of the amount, and fraudulently withheld the balance. And to cover this fraud, that he obtained from the recorder of deeds, copies of the prior mortgages on the estate of Jones; and at the foot of the catificate of the recorder, wrote himself "paid and satisfied;" and then exhibited the papers to Jones and the defendant, to show that he had discharged the mortgages. And as there also remained on the estate a prior lien of a judgment for 700 dollars, that Goodwin took a bond of indemnity from Jones against it.

That defendant often solicited Goodwin to deliver up to him the mortgage, which under various pretexts he declined doing; but assured the defendant that he had discharged the prior mortgages: at length the defendant becoming uneasy, he called at the recorder's office, and there found that the mortgage for 1500 dollars had not been discharged, and that the endorsement upon it of "paid and satisfied," must have been made by Goodwin. On the same day that the defendant made this discovery, Goodwin informed him that he was about to stop payment; but he assured the defendant that he should not lose a cent.

Goodwin admitted to the defendant that he had used the money for his own purposes, instead of paying off the mortgage; and that he had deceived both the defendant and Jones. And at the same time, Goodwin placed a mortgage in the hands of the defendant for 2575 dollars, to secure him against the mortgage on the property of Jones, which should have been discharged. That Goodwin assured him the property mortgaged was unincumbered, which was untrue; and the defendant reproached Goodwin with having again deceived him, and threatened him with an exposure, unless he should make payment or give security. Goodwin replied, "what can you do? if you push me, I will take the benefit of the insolvent law;" the defendant rejoined, "have you forgotten the certificate which you forged? My attorney informs me, that if Mr. Jones, or myself, shall come into court with that certificate, that you would be in danger of being sentenced to hard labour." Goodwin became alarmed, and stated, that he would sell the property and make good the deficiency, if the defendant would not expose him.

This conversation took place in the presence of Mrs. Goodwin; who, when the defendant was leaving the house, accompanied him

to the door, appealed to his friendship for her, entreated him not to expose the transaction, declared that she would not have it known, especially in the church, and among the congregation at Blockley, for any consideration whatever. She added, that Mr. Goodwin would sell the property, and make provision for the payment; and that she would make up the deficiency out of her separate estate; and neither the defendant nor his child, whose deceased mother she greatly esteemed, should lose any thing.

. A few days after this Mrs. Goodwin saw the certificate, and acknowledged that it was in the hand-writing of her husband; and she again entreated the defendant not to expose him, and said she would pay him if her husband did not. This assurance was fre-. quently repeated on various occasions up to the death of Goodwin; which took place, suddenly, in February, 1828. At the moment of his death, Mrs. Goodwin sent for the defendant, desired him to superintend the interment, and she threw herself upon his kindness for consolation. After the interment, the defendant spent the evening with Mrs. Goodwin, engaged in religious conversation; and being about to leave, she said, Mr. Ashton, I hope you will not forsake me. If you cannot come in the day time, come in the evening, and pray with me. I will be pleased to see you at any time; and as soon as I get a little over my trouble I will fulfil my promise and settle with you. The defendant replied, that he hoped she would not let his concern trouble her at that time; that it gave him not a moment's uneasiness.

This promise was repeated by Mrs. Goodwin again and again, and on one occasion, when the defendant was ill, she expressed uneasiness lest he might die before the matter was arranged. On consulting counsel, she was advised to do nothing with her property for a year, and he refused to draw a deed. But she said the advice was unjust, that she would pay the defendant, and felt herself bound to do so as a christian. And she delivered a covenant to the defendant, binding herself to make good the deficiency, should there be one, on the sale of her husband's estate. Up to this time, the defendant had not expressed a desire to Mrs. Goodwin that she should pay any part of her husband's debt.

In December, 1828, defendant stated to Mrs. Goodwin that she had acted voluntarily in the matter, and not through his persuasion. That if he might be permitted, for the first time, to become active in the business, he would suggest, that as her property was held in trust,

the covenant which she had executed to him was not valid. She expressed surprise, and a willingness to secure him; and the bond and mortgage in controversy were prepared and executed at the office of Thomas Mitchell, a scrivener. An agreement was executed by the defendant, declaring that the bond and mortgage were given as collateral security, &c.

With the exception of the execution of the bond and mortgage, the defendant denies all the material allegations of the bill.

The counsel for the complainants contend, that the proof sustains the charges in the bill; and that they are entitled to the relief prayed for, on the following grounds:

1. That there was no consideration for the bond and mortgage.

2. That they were executed by a weak woman; who, at the time, was incapable of making such a contract.

3. That they were extorted by a threat to prosecute her husband.

4. That the relation in which the defendant stood to her, as her pastor and religious visiter, and as agent and adviser in her affairs, prohibited any contract with her; especially when made in the absence of her counsel and with his known disapprobation.

As to the want of consideration alleged in the first position, it must be observed, that this is not an application to the Court for the specific execution of a contract; but to set one aside which is clothed with the highest solemnities known to the law. A contract under the hand and seal of the party; duly acknowledged, and placed upon the public records. This deed purports upon its face a consideration, whether it be considered at law or equity.

A court of chancery will often refuse to enforce a contract, specifically, when it would also refuse to annul it. In such a case, the parties are left to their remedy at law.

In the present case, as the deed purports a consideration, it is unnecessary for the defendant to prove one; and the deed is not vitiated, if the complainants show that it was given without a valuable consideration; unless there be connected with the transaction, mistake, deception, incapacity or fraud. The mortgage deed is impeached by the counsel on several of these grounds; all of which will be considered under the appropriate heads.

The second position assumed, is a want of capacity in Mrs. Goodwin to make a contract at the time the deed was executed.

This is the principal ground stated in the bill, and it covers a great portion of the evidence in the case. It is intimately connected with

[Jackson v. Ashton.]

the third position assumed, that the deed was extorted from Mrs. Goodwin by threats to prosecute her husband; and they will both be considered as one proposition.

Was Mrs. Goodwin of sound and disposing mind, at the time the mortgage deed was executed? Did she act freely and voluntarily?

The answer of the defendant is broader than the allegations in the bill, and although such parts of the answer as are not responsive to the bill, are not evidence for the defendant; yet the counsel on both sides have considered the facts disclosed, as belonging to the case. And, if the facts in the answer, not responsive to the bill, are relied on by the complainant's counsel as admissions by the defendant; he is entitled, thus far, to their full benefit.

It may be proper also to observe, that no admissions in an answer, can, under any circumstances, lay the foundation for relief under any specific head of equity, unless it be substantially set forth in the bill.

Several years ago, it seems, the defendant being a clergyman of the Baptist denomination, had the charge of a congregation at Block-ley, in or near to Philadelphia; and Mr. and Mrs. Goodwin were members of that church. But some time before the deed was executed, they removed from the limits of that congregation and resided in another.

From the business of Goodwin, he being a broker, and the connection which existed between him and the defendant, it was natural that the defendant should consult him, as to the investment he was desirous of making in 1822. And it is not extraordinary that the defendant should have confided in the integrity of Goodwin. It seems that this confidence was not easily shaken; for although the money was placed in his hands for investment, in March, 1822, yet the defendant did not discover the fraud of Goodwin, until the last of January, 1823; and then another fraud was practised by Goodwin, by giving another security of little or no value. It was under such circumstances, and with a knowledge that Goodwin was about to stop payment, that the defendant called at his house; charged him with another deception, and insisted on security or immediate payment. Goodwin threatened him with taking the benefit of the insolvent act; and then the defendant asked him if he had forgotten the certificate he had forged, and said if it were brought into court, he would be in danger of "going to hard labour."

That these were words of heat and passion, is evident. That there was strong provocation, is equally clear; still it had been better, had

he not uttered them. The high and holy calling of the defendant should have guarded him against the influence of passion. He should have remembered that those who are most sceptical, not unfrequently, make the highest exaction of purity in the station he occupied. But he was a man of like passions with others, and liable to err.

Did the defendant visit the house of Goodwin with the premeditated design of making this charge, in order to extort from Mrs. Goodwin a promise to indemnify him? That he did, is most earnestly contended by the counsel for the complainants; and he is charged with the greatest impropriety in making the charge against Goodwin in the presence of his wife.

This inference is not authorized by the facts and circumstances of the case.

As was very natural, Mrs. Goodwin felt great anxiety when she heard the charge, and was solicitous that her husband should not be exposed. She promised to make up any part of the debt to the defendant, which her husband should be unable to pay. This was about six years before Mrs. Goodwin executed the mortgage deed. On various occasions, during the lifetime of her husband, she repeated this promise to the defendant, as appears from the evidence, without his solicitation; and she made similar declarations to other persons.

As might be expected, the intercourse between the defendant and the family of Mr. Goodwin was, perhaps, after this, less frequent than it had been. On one occasion, however, his good offices were requested, to prevent the exhibition of the forged words, as evidence, in an action of slander brought by Goodwin. He interposed, but could not prevent the evidence from being offered.

It does not appear that the defendant threatened to commence a prosecution against Goodwin, but only said what he was informed would be the effect of a prosecution. The facts do not justify the conclusion that the defendant agreed to suppress the prosecution, on consideration of the promise of Mrs. Goodwin. That he confided in her promise is extremely probable, from the fact that he seems to have made little or no effort from this time until the death of Goodwin, five years afterwards, to obtain his money or additional security.

At length, in February, 1828, Goodwin died very suddenly. In her distress, Mrs. Goodwin sent for the defendant to superintend the last offices to her departed husband, and to impart to her the con-

[Jackson v. Ashton.]

solations of religion. This is admitted to afford the highest evidence of the confidence which she reposed in the friendship and piety of the defendant.

Did he abuse that confidence? It is said that he did. That he seized the occasion while the heart of Mrs. Goodwin was broken under the weight of her afflictions, to insinuate himself into her confidence, and acquire an ascendency over her; that he might wring from her the debt of her husband. And here the eloquence of the counsel has depicted, in strong colours, the base, hypocritical, and mercenary spirit of the defendant.

If, indeed, the picture is drawn from the life, and is not the work of the imagination; it presents human nature in so odious an aspect, as to create loathing and disgust.

Called to give consolation to a female overwhelmed by the sudden death of a husband, to whom, with all his imperfections, she was tenderly attached, and that husband lying a corpse in the house, or just deposited in the grave; can it be supposed, without the strongest evidence, that a wretch exists, so lost to all the better feelings of the heart, as to use such an occasion to extort from the widow the payment of a debt?

Both Mrs. Goodwin and the defendant have gone to their last and solemn account, and are alike beyond the reach of censure or praise; but no one could wish the charge against the defendant, in this respect, to be true. There is nothing in the evidence to justify it. He did not name the subject of the debt to Mrs. Goodwin, and when she mentioned it, as he was about taking leave, he begged her not to give herself any uneasiness on the subject; and it was not until near a year after this, that the mortgage deed was executed.

Six witnesses were examined by the complainants to show that at the time Mrs. Goodwin executed the deed, she had not the capacity to make a contract; and that she laboured under an improper influence exerted by the defendant.

Some of these witnesses resided with Mrs. Goodwin, and they all speak of her being ill, more or less, at different periods of time; as well before, as after the decease of her husband. She appears to have been rather of a dejected and melancholy cast of mind, and was often in a state of despondency. Some of the witnesses speak of times when her mind was shattered or impaired, while labouring under physical debility; and they state certain acts, which they considered as resulting from a mind somewhat unsettled and wandering.

[Jackson v Ashton.]

At one time she refused to attend her grand-daughter to church, who was to be received as a communicant; she declined family worship; would sometimes not answer questions; and on returning from a former country residence, shortly after the death of her husband, she seemed to be agitated, sat down in a chair, and burst into a flood of tears: She kept a boarding-house some time, and involved herself in debt. Miss Jackson, who refers to these circumstances, remarks, that she never knew Mrs. Goodwin to say a foolish thing, or do a foolish act; and except on the occasions specified, her conduct and conversation were intelligent and rational.

It would seem from the statement of the witnesses, that she was as subject to depression of spirits before the death of Mr. Goodwin, as afterwards.

Dr. Beatty attended Mrs. Goodwin, as a physician; first saw her in Lombard Street, in 1827. She laboured under great mental torpor, but had no serious organic disease. During the time she kept a boarding-house in Twelfth street, she managed her own concerns; did the principal work of the house, and often went to market. Mr. Dodge states, that after the death of Mr. Goodwin, she having more business to transact, was more active than she had been; but in two or three months she relapsed into her former state of mind, and seemed much depressed on the subject of her business. The witness hardly thinks she had sufficient capacity to transact any other than the ordinary business of life.

Some of the witnesses did not think her capable of conducting the business of a boarding-house; and certain acts of supposed miscalculation or extravagance are named.

It seems that the defendant occasionally called to see Mrs. Goodwin, but less frequently than she desired. In July, after the death of Mr. Goodwin, Miss Long, who lived with Mrs. Goodwin, was called down stairs to witness a written paper; and, after signing it, observed to the defendant that she did not know what she had signed. Mrs. Goodwin was present. The defendant said, it was a piece of writing between Mrs. Goodwin and himself. Mrs. Goodwin once or twice expressed herself uneasy about the business of the defendant; but there is no evidence that at any of his visits he importuned her on the subject of his claim, or that he took any active agency in the matter until about the time the mortgage was executed.

The scrivener who drew the bond and mortgage, and whose son drew the defeasance, states that Mrs. Goodwin, her trustee, and the

[Jackson v. Ashton.]

defendant, were present when they were signed. Much conversation was had on the subject of the papers, and Mrs. Goodwin was very attentive to the business. She did not seem to be labouring under any remarkable feebleness of body or mind. The mortgage was intended as collateral security; and the defeasance was drawn on a separate paper. Since the commencement of the present suit, the defeasance was handed to the scrivener by the defendant, who said he had borrowed it from the office; the paper had not been called for by the trustee.

Jewell, the trustee of Mrs. Goodwin, states that the defendant and Mrs. Goodwin called on him, and she observed that she wished to execute a mortgage on her property, to secure the defendant in a claim he had on her late husband; and on being asked if she had consulted Mr. Ingraham, her counsel, she replied, that she had not, and that he had treated her with coolness. She said the mortgage was intended as collateral security.

Some time after this, Mrs. Goodwin becoming somewhat embarrassed in her circumstances, relinquished her house; and the defendant undertook the settlement of her accounts.

Some ten or twelve witnesses, who were well acquainted with Mrs. Goodwin, before and after her husband's death, and about the time the deed was executed; were examined by the defendant to prove that she was of capacity to contract generally. Some of these witnesses had business with her, and speak of her acuteness and uncommon smartness. Others say that she was a woman of more than ordinary intelligence; that on religious subjects she was very well informed. One of the witnesses speaks of her as a remarkably sensible woman; heard her speak of the defendant as having been injured by her husband, and that it was right he should be made secure. She spoke of the defendant's kindness in not prosecuting her husband; and said, as the witness understood, partly for that, and other acts of kindness, the defendant ought to be made secure from loss.

On a careful examination of the whole evidence, as to the competency of Mrs. Goodwin to execute the mortgage at the time it was given, we are brought to the conclusion, that the ground of incapacity is not sustained. On the day the mortgage was executed, she was at the scrivener's with her trustee and the defendant; and it does not seem to have occurred, either to her trustee or the scrivener, that she was labouring under any incapacity of mind. She took an

active part in the business; understood perfectly the nature of the writings: and her whole deportment, on that occasion, showed that she was capable of acting for herself, in giving the security on her property.

Prior to this period, Mrs. Goodwin had given to the defendant a covenant to indemnify him; this was the paper witnessed by Miss Long, in July, 1828, and which was supposed not to be valid; the mortgage was given in lieu of this paper.

Was this mortgage deed executed through any threat by the defendant, to render the character of Goodwin infamous? There is not a shadow of proof to sustain this allegation of the bill, and *it is denied* by the answer.

The threat must be carried back to the conversation between the defendant and Goodwin, in the presence of his wife, respecting the forged certificate; and this was about six years before the deed was executed. And this circumstance *is relied on to show that this mort-gage was extorted from* Mrs. Goodwin.

The forgery, as it was improperly called, had been fully exposed in the action of slander brought by Goodwin; so that no apprehension, on that score, could have been felt by Mrs. Goodwin. Her husband lived about five years after the threat; and it appears, if, until the time of his death he did not continue on terms of particular intimacy with the defendant, there seems to have been no hostility between them. And can it be supposed, that the conversation could have so operated on the mind of Mrs. Goodwin, six years afterwards, as to extort from her the deed in question? The facts of the case authorize no such conclusion.

Did the defendant exercise any influence over the mind of Mrs. Goodwin, which can affect the contract?

That he relied on the repeated assurances given by her to indemnify him is clear. During the lifetime of her husband he does not appear to have resorted to any means to compel payment; and, after the death of Goodwin, he did not obtrude himself into the house of mourning as a creditor. He was there, but to perform the office of a comforter; and there is no evidence which shows any improper anxiety on his part to secure his debt. Until a short time before the execution of the mortgage deed, so far as the history of the case is known, Mrs. Goodwin was the first to introduce the subject; and, on one occasion, expressed no small anxiety to give the indemnity.

It was not until the covenant was found to be invalid that he be-

[Jackson v. Ashton.]

came active in the business; and then, it would seem; that he introduced the subject in the most delicate manner.   On being informed of the invalidity of the covenant, she expressed a perfect willingness to give the mortgage. .

The mortgage does not cover the entire estate of Mrs. Goodwin; so that, by giving it, she did not strip herself of the means of support.

It seems, that some time after the mortgage was executed, on being told that the defendant would distress her, she expressed a determination to dispute the deed; but on being assured by the defendant, that during her life he should not embarrass her by pressing the claim, she became perfectly satisfied.   This dissatisfaction seems to have been excited by one of the persons named as complainant.

That the defendant should have felt some anxiety to secure the claim, was very natural.   It was money which came into his hand as the guardian of his child, whose mother was deceased.   But there was no part of the defendant's conduct, either before or after the death of Goodwin, which shows a disposition to exercise a fraudulent or improper influence over Mrs. Goodwin in this matter.   She acted voluntarily; and, so far as appears in the evidence, free from any influence that goes to impeach the contract.

In taking the defeasance from the office of the scrivener, the defendant seems to have had no improper design.   He borrowed it from the clerk in the office; probably, and most likely, forgot to return it.   He returned it since the commencement of this suit; which he would not have done had he taken, the paper with a dishonest or fraudulent intention.

The motive which led Mrs. Goodwin to give this indemnity, was highly honourable to her feelings as a wife, a christian and friend. She had property of her own.   She saw that her friend had been injured by the fraudulent conduct of her husband; and, whilst she threw a mantle over the imperfections of her husband, she endeavoured to repair the injury he had done.

We come now to consider the fourth ground taken by the complainants; which is, that from the relation which existed between the defendant and Mrs. Goodwin, she could make no valid contract with him.   He was her pastor and agent.

After her embarrassments commenced, at the request of her trustee, the defendant did undertake the settlement of her affairs; to which service he seems to have been prompted by the kindest feelings towards her.   We cannot suppose that this agency, which was

[Jackson v. Ashton.]

in fact undertaken after the mortgage was executed, could vitiate any contract. About the time the mortgage was executed, and before that time, he seems to have had no special agency in the business of Mrs. Goodwin.

But he is represented to have been her pastor. Some years before the mortgage deed was signed, Mrs. Goodwin did belong to the church under the charge of the defendant; but this relation had ceased long before the death of Goodwin: but if this relation existed in fact, it is not charged in the bill.

Does the profession of a clergyman subject him to suspicions which do not attach to other men? Is he presumed to be dishonest?

It would, indeed, exhibit a most singular spectacle, if this Court by its decision should fix this stain on the character of a class of men, who are generally respected for the purity of their lives, and their active agency in the cause of virtue. They are influential, it is true; but their influence depends upon the faithfulness and zeal with which their sacred duties are performed.

Acquainted as we are with the imperfections of our nature, we cannot expect to find any class of men exempt from human infirmities. But why should the ministers of the gospel, who as a class are more exemplary in their lives than any other, be unable to make a contract with those who know them best and love them most.

Their influence, by precept and example, does more to reform the actions of men, and restrain their vicious inclinations, than all the institutions of society. And yet we are called upon to denounce this whole class, and hold them incapable of making a contract with those who are under their pastoral charge, and who, like Mrs. Goodwin, are distinguished for their piety.

Why not give them the same measure of right which is enjoyed by others? If any minister should become a traitor to his master, and disgrace his high and holy calling by using, for fraudulent purposes, his influence over the weak or unwary, the law affords a remedy: and the proceedings in this case show, that the disposition will not be wanting to bring him to an account.

Upon a deliberate consideration of the facts and circumstances of this case, we are of the opinion, that the decree of the circuit court ought to be affirmed, with costs.