Thomas DENNEY, R. Thomas Weeks, Norman R. Kirisits, Kathryn M. Kirisits, TD Cody Investments, L.L.C., RTW Investments, L.L.C., NRK Syracuse Investments, L.L.C., DKW Partners, DKW Lockport Investors, Inc., Donald A. Destefano, Patricia J. Destefano, DD Tiffany Circle Investments L.L.C., Tiffany Circle Partners, Dia-

mond Roofing Company, Inc., Jeff Blumin, JB Hilltop Investments L.L.C., Kyle Blumin, KB Hoag Lane Investments, L.L.C., L. Michael Blumin, MB St. Andrews Investments, L.L.C., Fayetteville Partners, and Laurel Hollow Investors, Inc., on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

JENKENS & GILCHRIST, a Texas Professional Corporation, Jenkens & Gilchrist, an Illinois Professional Corporation, BDO Seidman, L.L.P., Pasquale & Bowers, L.L.P., Cantley & Sedacca, L.L.P., Dermody, Burke, and Brown, Certified Public Accountants, PLLC, Paul M. Daugerdas, Paul Shanbrom, Edward Sedacca, Deutsche Bank Ag, and Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex Brown, A Division of Deutsche Bank Securities, Inc., Defendants.

No. 03 Civ. 5460(SAS).

United States District Court, S.D. New York.

April 30, 2004.

David R. Deary, Ralph Canada, Shore & Deary, L.L.P., Dallas, TX, for Plaintiffs.

Douglas E. Whitney, Michael A. Pope, McDermott, Will & Emery, Chicago, IL, for Defendants Jenkens & Gilchrist and Paul Daugerdas.

Michael R. Young, Michelle Nadel, Brian A. Turetsky, Willkie Farr & Gallagher, New York City, for Defendants BDO Seidman and Paul Shanbrom.

Ronald S. Herzog, Snow Becker Krauss P.C., New York City, for Defendants Pasquale & Bowers.

Lawrence M. Hill, Seth C. Farber, Dewey Ballantine, L.L.P., New York City, for Defendants Deutsche AG and Deutsche Bank Securities.

Kenneth A. Payment, Harter, Secrest & Emery L.L.P., Rochester, NY, for Defendants Dermody, Burke & Brown.

Todd Belous, Shari Lewis, Rivkin Radler L.L.P., Uniondale, NY, for Defendants Cantley & Sedacca.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs allege in this putative class action that defendants violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and are liable for damages and other relief arising from unjust enrichment, breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duties, fraud, negligent misrepresentation, professional malpractice, "unethical, excessive and illegal fees," and conspiracy.[1] The BDO Defendants,

---

1. Plaintiffs, acting on behalf of themselves and all others similarly situated, include: Thomas Denney, R. Thomas Weeks, Norman Kirisits, Kathryn M. Kirisits, NRK Syracuse Investments, L.L.C., RTW High Investments, L.L.C., TD Cody Investments, L.L.C., DKW Lockport Investments, Inc., DKW Partners, (collectively, the "Denney Plaintiffs"), Donald A. DeStefano, Patricia J. DeStefano, DD Tiffany Circle Investments, L.L.C., Tiffany Circle Partners, Diamond Roofing Company Inc. (collectively, the "DeStefano Plaintiffs"), Jeff Blumin, Kyle Blumin, L. Michael Blumin, JB Hilltop Investments L.L.C., KB Hoag Lane Investments, L.L.C., MB St. Andrews Investments, L.L.C., and Laurel Hollow Investors, Inc. (collectively, the "Blumin Plaintiffs").

Defendants include: Jenkens & Gilchrist, a Texas Professional Corporation, Jenkens & Gilchrist, an Illinois Professional Corporation, Paul M. Daugerdas (collectively, the "Jenkens Defendants"), BDO Seidman, L.L.P., Paul Shanbrom (collectively, the "BDO Defendants"), Pasquale & Bowers, L.L.P., Dermody, Burke, and Brown, Certified Public Accounts (collectively, the "Pasquale Defendants") Cantley & Sedacca,

Pasquale Defendants, and Deutsche Bank Defendants now move to compel arbitration.

## I. FACTS

### A. Background

This case arises out of tax and consulting services offered by several professional law and accounting firms, and marketed to three groups of investors. In the First Amended Class Action Complaint ("Compl."), the plaintiff investors allege that in 1999, the Jenkens Defendants developed a tax shelter known as Currency Options Bring Reward Alternatives, or "COBRA." [2] Thereafter, the Jenkens defendants recruited the BDO Defendants to market COBRA, and the BDO Defendants, in turn, asked the Pasquale Defendants to assist BDO and Jenkens in directly marketing COBRA to Pasquale's and Dermody's wealthy clients. *See* Compl. ¶ 72.

Because of their longstanding relationships with the individual plaintiffs,[3] the Pasquale Defendants had intimate knowledge of the individual plaintiffs' finances, and therefore knew that in 1999, the plaintiffs expected substantial capital gains from certain stock holdings. *See id.* ¶¶ 78–79. The Pasquale Defendants told

the plaintiffs about a "loophole" in the Internal Revenue Code that could reduce their taxes, and recommended that plaintiffs meet with the BDO Defendants to learn more about COBRA. The plaintiffs subsequently met with Paul Shanbrom of BDO, who described the COBRA tax strategy. *See id.* ¶¶ 80–83. Specifically, Shanbrom told plaintiffs that "by forming a partnership to engage in foreign currency option transactions, it was possible to create large capital and/or ordinary losses for tax purposes that would largely eliminate or offset their expected substantial capital gain and/or ordinary income in 1999." *Id.* ¶ 83. Shanbrom assured plaintiffs that BDO had an independent opinion letter from Jenkens & Gilchrist, a major law firm, substantiating the legality and validity of the COBRA tax shelter. *See id.* ¶ 82.

In October, 1999, the plaintiffs agreed to engage in COBRA transactions. At the recommendation of the BDO and Pasquale Defendants, plaintiffs retained Jenkens & Gilchrist to provide legal advice relating to COBRA. *See id.* ¶¶ 92–93. And on the advice of the Jenkens Defendants, the individual plaintiffs formed various corporate entities (the "corporate plaintiffs") in order to carry out the COBRA transactions.[4] *See id.* ¶¶ 93–101.

L.L.P., Edward Sedacca (collectively, the "Cantley Defendants"), Deutsche Bank AG, and Deutsche Bank Securities, Inc. (collectively, the "Deutsche Bank Defendants").

2. The details of COBRA are complicated, and need not be described for purposes of this motion. In brief, however, COBRA investors entered into digital option foreign exchange contracts as part of a tax advantage investment strategy: the investors executed these contracts, and claimed resulting losses on their tax returns.

3. The individual plaintiffs include: Thomas Denney, R. Thomas Weeks, Norman R. Kirisits, Kathryn M. Kirisits, Donald A. DeStefano, Patricia J. DeStefano, Jeff Blumin, Kyle Blumin, and L. Michael Blumin.

4. The corporate plaintiffs include: TD Cody Investments, L.L.C., RTW High Investments, L.L.C., NRK Syracuse Investments, L.L.C., DKW Partners, DKW Lockport Investors, Inc., DD Tiffany Circle Investments, L.L.C., Tiffany Circle Partners, Diamond Roofing Company, JB Hilltop Investments, L.L.C., KB Hoag Lane Investments, L.L.C. MB St. Andrews Investments, L.L.C., Fayetteville Partners, and Laurel Hollow Investors, Inc. Notably, plaintiff Diamond Roofing Company is a general partner of Tiffany Circle Partners. *See* Compl. ¶ 93. However, it is not clear from the complaint whether Diamond Roofing Company was formed on the advice of the Jenkens Defendants and for the purpose of engaging in COBRA transactions, or whether it already existed at the time the corporate plaintiffs were formed.

The Jenkens Defendants provided various instructions to plaintiffs so that plaintiffs could carry out the COBRA transactions. In particular, the Jenkens Defendants referred plaintiffs to the Deutsche Bank Defendants, and the Deutsche Bank defendants subsequently advised plaintiffs to open accounts at DB Alex Brown. Thereafter, the Deutsche Bank and Jenkens Defendants counseled plaintiffs with respect to the COBRA transactions, and carried out the transactions on plaintiffs' behalf. *See id.* ¶¶ 92–127.

Plaintiffs' COBRA transactions resulted in losses. The Pasquale and BDO Defendants prepared plaintiffs' tax returns for 1999, and utilized the COBRA losses to offset plaintiffs' capital gains in those returns. Plaintiffs signed and submitted the returns to the Internal Revenue Service ("IRS") and state taxing authorities. *See id.* ¶¶ 152–65. Plaintiffs contend that at the time the BDO and Pasquale Defendants prepared the tax returns and advised plaintiffs to sign the returns, they knew or should have known that on December 27, 1999, the IRS issued a notice indicating that losses arising from "transactions wholly lacking in economic substance (*e.g.* COBRA) are not properly allowable for Federal income tax purposes." *Id.* ¶ 146.

In August, 2000, the IRS published a notice that "clearly and unequivocally informed accountants and tax attorneys across the country that [the IRS] believed the COBRA tax shelter was illegal ... [and that] the IRS believed it had [ ] addressed transactions like COBRA in [the December 27, 1999] notice ..." *Id.* ¶ 171. Nonetheless, the Jenkens Defendants continued to issue opinion letters attesting to the validity and legality of the COBRA transactions, and advising plaintiffs that the COBRA losses could properly be used as capital and ordinary losses for tax purposes. Additionally, the Pasquale Defendants prepared plaintiffs' 2000 tax returns to reflect the COBRA losses, and on the advice of the Pasquale Defendants, plaintiffs signed and submitted those returns to the IRS. *See id.* ¶¶ 175–81.

The DeStefano Plaintiffs completed their COBRA transactions in 2001.[5] The Pasquale and BDO defendants subsequently advised the DeStefano Plaintiffs that they should retain the Cantley Defendants, rather than the Jenkens Defendants, to provide an opinion letter with respect to the propriety of utilizing the COBRA losses on the DeStefanos' 2001 tax returns. The Cantley Defendants provided such an opinion letter in April, 2002. According to plaintffs, the Cantley Defendants knew the letter was "bogus" at the time it was issued. Plaintiffs further allege that the BDO and Pasquale Defendants advised the DeStefano Plaintiffs to retain Cantley & Sedacca in late 2001 because the Jenkens Defendants were unwilling to issue an opinion letter in light of the IRS notices. *See id.* ¶¶ 184–91.

In December, 2002, the New York State Revenue Department notified plaintiffs that the Tax Shelter Unit had selected their 1999 state income tax returns for audit. The DeStefano Plaintiffs were further notified that their 2000 income tax returns had also been selected for audit. The IRS subsequently notified all plaintiffs that their 1999 federal tax returns had been selected for audit, and notified the DeStefano Plaintiffs that their 1999, 2000, and 2001 returns had been selected for audit. *See id.* ¶ 201. Nonetheless, in January, 2003, the BDO Defendants advised plaintiffs not to participate in either the

---

**5.** Though not entirely clear from the complaint, it appears that the Denney Plaintiffs and Blumin Plaintiffs completed their COBRA transaction in 2000.

federal or the New York State tax amnesty programs. *See id.* ¶ 203.

In June, 2003, the IRS "formalized its position regarding CORBA . . . by issuing new regulations [ ] retroactive to October 18, 1999 . . . The Regulations invalidate COBRA . . ." *Id.* ¶ 223. The IRS further indicated that the COBRA transactions are invalid under both the new regulations, and under two existing provisions of the Internal Revenue Code. *See id.* ¶ 225.

In addition to the losses plaintiffs experienced in carrying out the COBRA transactions, plaintiffs have incurred and will continue to incur substantial damages in the form of fees paid to attorneys and accountants retained to address the audits.[6] *See id.* ¶¶ 229–38.

### B. The Written Agreements

#### 1. The Blumin Contract

On October 8, 1999, plaintiff L. Michael Blumin, on behalf of Jefyle Equipment Corp., Inc., entered into a consulting agreement with BDO (the "Blumin Agreement"). The Blumin Agreement was effective through September 30, 2000, and included the following language:

WHEREAS, [Jefyle Equipment Corp.] is interested in expanding its business operations into new strategic markets (the "Expansion");
WHEREAS, BDO is in the business of providing accounting and consulting services; and
WHEREAS, [Jefyle Equipment Corp.] desires BDO to provide certain tax, financing and business consulting services in connection with the Expansion, and BDO desires to provide such services . . .

Consulting Agreement between BDO and Jefyle Equipment Corp., Ex. 4 to the Affidavit of Michael R. Young ("Young Aff."), counsel to the BDO Defendants, at "whereas" clauses.

The contract required BDO to provide the following services: "assistance in financing business, real estate ventures and financing corporation activities, assistance with like kind exchanges, assistance with leasing transaction issues, assistance in planning the Expansion, and assisting [Jefyle Equipment Corp.] and/or its advisors in determining *tax treatments* of the transactions associated with the Expansion." *Id.* ¶ 2 (emphasis added). In consideration for these services, Jefyle Equipment Corp. was required to pay BDO a fee of $315,000, on or before October 29, 1999.

---

**6.** The Pasquale Defendants argue that this action is not ripe for adjudication because "no determination has been made whether .[sic] the losses plaintiffs' previously claimed pursuant to their respective COBRA transactions can successfully be challenged by the taxing authorities." Memorandum of Law of Pasquale & Bowers in Support of Motion at 15. The Pasquale Defendants suggest that "a compromise with the taxing authorities, which would allow plaintiffs to retain some portion of their previously claimed losses, could easily eliminate any valid damage claim." *Id.* This argument is misplaced. The fact that plaintiffs may not ultimately owe the IRS additional taxes, does not mean that their action is not ripe. Plaintiffs allege that they have been damaged, and continue to be damaged, as a result of defendants' conduct.

Their damages include losses incurred in the COBRA transactions, as well as expenses paid to accountants and attorneys that are assisting plaintiffs in defending the audits. These injuries are immediate and definite, and therefore satisfy the case or controversy requirement contained in Article III of the Constitution. *See Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 81, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) ("To the extent that issues of ripeness involve [ ] the existence of a live 'Case or Controversy,' [a] conclusion that [the complaining party] will sustain immediate injury . . . and that such injury would be redressed by the relief requested would appear to satisfy this [constitutional] requirement." (internal citation and quotation marks omitted)).

The Blumin Agreement also contained a mandatory arbitration clause:

If any dispute, controversy or claim arises in connection with the performance or breach of this Agreement and cannot be resolved by facilitated negotiations (or the parties agree to waive that process) then such dispute, controversy or claim shall be settled by arbitration in accordance with the laws of the State of New York, and the then current Arbitration Rules for Professional Accounting and Related Disputes of the American Arbitration Association ("AAA") except that no pre-hearing discovery shall be permitted unless specifically authorized by the arbitration panel, and shall take place in the city in which the BDO office providing the relevant Services exists, unless the parties agree to a different locale.

*Id.* ¶ 7(d).

### 2. The Denney Plaintiffs' Contract

On October 12, 1999, Thomas Denney, R. Thomas Weeks, Norman R. Kirisits, and BDO executed a consulting agreement (the "Denney Agreement"). The Denney Agreement expired on December 31, 1999, and contained the following language:

WHEREAS, [Denney, Weeks, and Kirisits are] interested in transferring, by sale, lease or otherwise, any or all of [their] business operations (such business operations, the "Business" and such transfer, the "Transaction");

WHEREAS, BDO is in the business of providing accounting and consulting services; and

WHEREAS, [Denney, Weeks, and Kirisits] desire[ ] BDO to provide certain tax, financing and business consulting services in connection with the Transaction, and BDO desires to provide such services . . .

Consulting Agreement between BDO and Denney, Weeks, and Kirisits, Ex. 2 to the Young Aff., at "whereas" clauses. Pursu-

ant to the contract, BDO was required to provide the following services: "consulting services in connection with the Transaction, assisting [Denney, Weeks, and Kirisits] in determining a *tax treatment* for the Transaction, and the preparation of the 1999 and 2000 income tax returns that would reflect the Transaction." *Id.* ¶ 2 (emphasis added). The amount Denney, Weeks, and Kirisits owed BDO under the terms of the contract is unclear because the contract stated that they "shall pay BDO the following fees: $220,000 (Three Hundred Fifteen Thousand Dollars)." *Id.* ¶ 3(a). Finally, the Denney Agreement also contained a mandatory arbitration clause that is identical to the arbitration clause in the Blumin Agreement. *See id.* ¶ 8(d).

### 3. The DeStefano Contract

On November 2, 1999, plaintiff Diamond Roofing Co., Inc. entered into a consulting agreement with BDO (the "DeStefano Agreement"). The DeStefano Agreement was effective through September 30, 2000, and included the following language:

WHEREAS, [Diamond Roofing Co., Inc.,] is interested in expanding its business operations into new strategic markets (the "Expansion");

WHEREAS, BDO is in the business of providing accounting and consulting services; and

WHEREAS, [Diamond Roofing Co., Inc.] desires BDO to provide certain tax, financing and business consulting services in connection with the Expansion, and BDO desires to provide such services . . .

Consulting Agreement between BDO and Diamond Roofing Co., Inc., Ex. 3 to the Young Aff., at "whereas" clauses. The services that BDO was to provide under the agreement were the same services that BDO provided pursuant to the terms of the Blumin Agreement. *See id.* ¶ 2. In

consideration for these services, Diamond Roofing Co. was required to pay BDO a fee of $510,000. *See id.* ¶ 3(a). The DeStefano Agreement contained the same mandatory arbitration clause as the Blumin and Denney Agreements. *See id.* ¶ 7(d).

## II. LEGAL STANDARD

■■■■■ The determination of whether a dispute is arbitrable under the FAA comprises two questions: "(1) whether there exists a valid agreement to arbitrate at all under the contract in question ... and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement." *Hartford Acc. and Indem. Co. v. Swiss Reinsurance Amer. Corp.*, 246 F.3d 219, 226 (2d Cir.2001) (quoting *National Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129, 135 (2d Cir.1996)). To find a valid agreement to arbitrate, a court must apply the "generally accepted principles of contract law." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir.1987). "[A] party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such obligation." *Id.* A court should consider only "whether there was an objective agreement with respect to the entire contract." *Id.*

■■■■■ Because there is "a strong federal policy favoring arbitration ... where [ ] the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement

should be resolved in favor of arbitrability." *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir.2002) (internal quotation marks and citations omitted). Thus, the Second Circuit has emphasized that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. Accordingly, [f]ederal policy requires us to construe arbitration clauses as broadly as possible. We will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 19 (2d Cir.1995); *see also WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir.1997). However, although federal policy favors arbitration, it is a matter of consent under the FAA, and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir.2001) (quoting *AT & T Techs., Inc. v. Communications Workers of America.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)).

## III. DISCUSSION

### A. The Parties' Arguments

The BDO defendants contend that "at least one representative of each group" of plaintiffs entered into a consulting agreement with BDO, and that those consulting agreements contained broad, mandatory arbitration clauses.[7] Memorandum of Law

---

7. The defendants do not contend that every member of the putative class entered into identical contracts. In fact, even the contracts entered into by BDO and certain of the *named* plaintiffs are not identical. *See supra*, Part I.B. Although a defendant may be able to compel arbitration in a putative class action where all potential class members entered into identical agreements, *see Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir.2002), defendants in this action have

failed to submit any evidence that all putative class members entered into identical agreements containing an arbitration clause. Thus, defendants' motion to compel arbitration and dismiss the complaint in its entirety is inappropriate with respect to the unidentified, putative class members. The Court will therefore deem the pending motions as motions to compel arbitration and dismiss the

of BDO Seidman, L.L.P. and Paul Shambron in Support of their Motion to Compel Arbitration and Dismiss the Complaint at 3. The BDO Defendants further argue that because plaintiffs' causes of action arise out of services provided pursuant to the consulting agreements, the Court should compel arbitration.[8] *See id.* at 4–9.

Plaintiffs, on the other hand, argue that the consulting agreements did not encompass the tax shelter services provided by defendants. In support of this argument, plaintiffs point out that by their terms, the consulting agreements were executed so that BDO could assist Jefyle Equipment Corporation, a non-party, and plaintiff Diamond Roofing Company, with business expansions, and advise Denney, Weeks and Kirisits with the transfer, sale or lease of their businesses. Because their causes of action arise out of tax shelter advice, and not the services identified in the consulting agreements, plaintiffs contend that the arbitration clauses are inapplicable.

## B. The Consulting Agreement Are Mutually Fraudulent

■ During a telephone conference on April 14, 2004, the Court asked counsel for plaintiffs whether the consulting agreements were entered into in anticipation of the tax shelter advice that BDO intended to provide to plaintiffs. Specifically, the Court asked counsel whether BDO had any relationship with plaintiffs "apart from the relationship they may have had with

respect to [COBRA]." 3/14/04 Transcript ("Tr.") at 6. Plaintiffs' counsel told the Court that Denney, Weeks and Kirisits "had already sold their business" at the time they entered into the consulting agreement, and "BDO had nothing to do with it." *Id.* at 6, 10. Similarly, although Jefyle Equipment and Diamond Roofing Company entered into consulting agreements with BDO providing that BDO would render advice regarding business expansions, BDO never provided any such services to Jefyle or to Diamond. *See id.* at 10. Plaintiffs' counsel went so far as to acknowledge that the consulting agreements "appear to be some kind of trick [ ] in the sense [that] I think the use of the word 'cover' may well be appropriate in reality." *Id.* at 6. Nonetheless, both parties agree that BDO was paid in connection with the consulting agreements. *See id.* at 11.

Based on the representations by counsel for plaintiffs and BDO, as well as the extraordinarily vague language contained in the consulting agreements, I conclude that BDO and plaintiffs engaged in mutual fraud when they executed the consulting agreements.[9] It appears that neither plaintiffs nor BDO wanted any third party to know the nature of the contracts into which they entered, or that BDO had contracted with plaintiffs to provide tax shelter advice. As a result, they entered into agreements that described consulting work

complaint with respect to the named plaintiffs only.

**8.** The Pasquale Defendants and Deutsche Bank Defendants submit that although they were not signatories to the consulting agreements, they may enforce the arbitration clauses contained in the agreements because plaintiffs allege that the BDO Defendants acted in concert with the Pasquale Defendants and Deutsche Bank Defendants. *See* Memorandum of Law of Pasquale & Bowers in Support of Motion at 5–10; Memorandum of Law of

Deutsche Bank AG and Deutsche Bank Securities, Inc. in Support of their Motion to Compel Arbitration and Dismiss the Complaint or in the Alternative to Stay the Action at 5–11.

**9.** During the April 14 conference called, I expressed a tentative view that these contracts were mutually fraudulent. "[T]he point is both sides were in on the wink and the nod." Tr. at 6. Later, I said, "You are sort of saying it is a fraud and both sides knew it." *Id.* at 10. Tellingly, neither party disagreed with these statements.

that was never performed and that was different from the consulting services that were actually provided. This conclusion is supported by the statements of counsel during the April 14, 2004 telephone conference, as well as the fact that while BDO apparently never provided any services to plaintiffs *other* than tax shelter advice, plaintiffs paid BDO in accordance with the consulting agreements.[10]

A venerable principle of contract law provides that where a contract is fraudulent, and the parties are both responsible for perpetrating the fraud, courts will "neither enforce nor annul" the contract. *Gardenier v. Tubbs*, 21 Wend. 169, 169 (N.Y.1839); *see also Jackson v. Ashton*, 36 U.S. 229, 239, 11 Pet. 229, 9 L.Ed. 698 (1837). This is true even if the parties are not equally at fault. *See* Richard A. Lord, *Williston on Contracts* § 19:79 (4th ed.1998).

> A contract [ ] between two or more individuals cannot be said to be generally devoid of all public interest. If it be of no interest, *why enforce it?* For note that in enforcing contracts, *the government does not merely allow two individuals to do what they have found pleasant in their eyes.* Enforcement, in fact, puts the machinery of the law in the service of one party against the other. When that is worthwhile and how that should be done are important questions of public policy ... *[T]he notion that in enforcing contracts the state is only giving effect to the will of the parties rests upon an ... untenable theory as to what the enforcement of contracts involves.*

Cohen, *The Basis of Contract*, 46 Harv. L.Rev. 553, 562 (1933) (emphases added). Thus, courts cannot enforce fraudulent

contracts any more than they can enforce unconscionable contracts because a court must not allow itself to become a party to an unenforceable agreement. *Cf. Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 537 N.Y.S.2d 787, 534 N.E.2d 824, 828 (1988) (under New York law, unconscionable contracts are not enforceable).

Because I conclude that the consulting agreements containing the arbitration clauses are mutually fraudulent, the contracts cannot be enforced.[11] *See Jackson*, 36 U.S. at 229, 11 Pet. 229; *Gardenier*, 21 Wend. at 169. As there is no valid agreement to arbitrate, the BDO Defendants' motion to compel arbitration is denied. *See Hartford*, 246 F.3d at 226; *Genesco*, 815 F.2d at 845. Moreover, because the Pasquale and Deutsche Bank Defendants' motions to compel arbitration are premised entirely on the mutually fraudulent BDO consulting agreements, their motions are also denied.

## IV. CONCLUSION

For the foregoing reasons, the motions of the BDO Defendants, the Pasquale Defendants, and the Deutsche Bank Defendants are denied. Plaintiffs' motion to strike the affidavit of Paul Shanbrom is denied as moot. The Clerk of the Court is directed to close these motions [docket # s 39, 50, 52, 58, 59, 64]. A conference is scheduled for May 10, 2004, at 2:30 p.m.

SO ORDERED.

---

**10.** Moreover, during the telephone conference, I offered the parties an opportunity to engage in discovery to determine the true

purpose of the consulting agreements, and both parties declined. *See Tr.* at 16.

**11.** Notably, they also cannot be rescinded.