Thomas DENNEY, R. Thomas Weeks, Norman R. Kirisits, Kathryn M. Kirisits, TD Cody Investments, L.L.C., RTW Investments, L.L.C., NRK Syracuse Investments, L.L.C., DKW Partners, DKW Lockport Investors, Inc., Donald A. Destefano, Patricia J. Destefano, DD Tiffany Circle Investments L.L.C., Tiffany Circle Partners, Diamond Roofing Company, Inc., Jeff Blumin, JB Hilltop Investments L.L.C., Kyle Blumin, KB Hoag Lane Investments, L.L.C., L. Michael Blumin, MB St. Andrews Investments, L.L.C., Fayetteville Partners, and Laurel Hollow Investors, Inc., on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

JENKENS & GILCHRIST, a Texas Professional Corporation, Jenkens & Gilchrist, an Illinois Professional Corporation, BDO Seidman, L.L.P., Pasquale & Bowers, L.L.P., Cantley & Sedacca, L.L.P., Dermody, Burke, and Brown, Certified Public Accountants, PLLC, Paul M. Daugerdas, Paul Shanbrom, Edward Sedacca, Deutsche Bank AG, and Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex Brown, A Division of Deutsche Bank Securities, Inc., Defendants.

No. 03 Civ. 5460 SAS.

United States District Court,
S.D. New York.

Nov. 23, 2004.

David R. Deary, W. Ralph Canada, Shore & Deary, L.L.P., Dallas, Texas, Jeffrey Daichman, Nahum Kainovsky, Kane Kessler, P.C., New York City, Joe R. Whatley, Jr., Othni Lathram, Whatley Drake, L.L.C., Birmingham, Alabama, Ernest Cory, Cory Watson Crowder & Degaris, P.C., Birmingham, Alabama, for Plaintiffs.

Michael R. Young, I. Bennett Capers, Anamika Samanta, Wilkie Farr & Gallagher, L.L.P., New York City, Richard Hans, Cary Samowitz, Piper Rudnick, L.L.P., New York City, for Defendants BDO Seidman, L.L.P. and Paul Shanbrom.

John Lindquist, Trial Attorney, United States Department of Justice, Tax Division, Washington, D.C., David S. Jones, Assistant United States Attorney, Tax and Bankruptcy Unit Chief, United States Attorney's Office, Southern District of New York, New York City, for the Government (An Interested Non–Party).

## OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

### A. The Evidentiary Determination

At issue here is a memorandum (the "Kerekes Memorandum") dated August 11, 2000, written by Michael Kerekes, a partner at BDO Seidman, L.L.P. ("BDO").[1] Plaintiffs, who obtained the memo from defendant Jenkens & Gilchrist ("Jenkens"), seek to make use of the Kerekes Memorandum in this action and in related actions across the country. BDO contends that the memo is privileged. Plaintiffs have moved for a determination of the privilege issue. For the following reasons, I find that any privilege that may have attached to the Kerekes Memorandum has been waived.

### B. Plaintiffs' Motion to Lift the Stay

Plaintiffs seek to use the Kerekes Memorandum in support of their motion to lift the stay of this action pending the outcome of an appeal by certain defendants of this Court's decision to deny defendants' motion to compel arbitration of this dispute. Because I conclude that the Kerekes Memorandum is not privileged, I will address plaintiffs' motion to lift the stay. For the following reasons, plaintiffs' motion is granted.

## II. BACKGROUND

In connection with the preliminary class settlement with Jenkens in this case, Jenkens produced documents, including the Kerekes Memorandum, to plaintiffs' counsel, who are also Lead Class Counsel.[2] Plaintiffs' counsel first attempted to use the Kerekes Memorandum in a case similar to the present action, *Miron v. BDO Seidman, L.L.P.*, pending in the Eastern

---

1. The allegedly privileged memorandum was submitted to the Court by plaintiffs as an exhibit to their motion to lift the stay. *See* Kerekes Memorandum, Ex. A to Plaintiffs' Notice of Motion to Lift Stay Served October 21, 2004, at 5.

2. Jenkens has also produced the memo to the Government, in response to IRS summonses issued in the Northern District of Illinois. *See United States v. Jenkens & Gilchrist, P.C.*, No. 03 C 5693 (N.D.Ill.).

District of Pennsylvania.[3] Plaintiffs' counsel filed a Motion for Leave to Supplement the Record with the Kerekes Memorandum. BDO, arguing that the memo was privileged, opposed the motion and cross-moved to compel plaintiffs' counsel to return the memo. The Honorable J. Curtis Joyner held, for the purposes of *Miron* only, that the memo was privileged.[4] Plaintiffs now ask this Court to find that the memo is not privileged.

## III. FINDINGS OF FACT

Michael Kerekes, the author of the Kerekes Memorandum, is a partner at BDO, and, at the relevant time, was a member of BDO's Tax Solutions Opinions Committee.[5] The memo is addressed to David Dreier, a lawyer at White & Case, L.L.P., and to the other members of BDO's Tax Solutions Opinion Committee. The memo discusses the effective date of the then recently-issued IRS Notice 2000–44 and the effect of the notice on the requirement that BDO maintain lists of taxpayers participating in certain tax shelter transactions.

How the Kerekes Memorandum came into the possession of Jenkens is the subject of dispute. Plaintiffs rely on the affidavit testimony of Donna Guerin, a Jenkens shareholder, to the effect that she was faxed a copy of the memo by Robert Greisman, a partner at BDO and a member of the Tax Solutions Opinion Committee.[6] Guerin did not retain a copy of the fax cover sheet.[7] Her copy of the memo does not have a phone number, and the pages are out of order.[8] The fax appears to have been sent on January 19, 2001, at 3:59 p.m.

Guerin recalls discussing the memo and its contents with Greisman. According to Guerin, Greisman "wanted Jenkens to reconsider the text of opinion letters that it planned to send to those clients that Jenkens had advised who were also clients of BDO, to harmonize such text.... As part of the back-up for his argument, Greisman sent me the [Kerekes Memorandum]."[9] Guerin has also submitted a copy of another memorandum, sent by Greisman via fax on January 22, 2001, on the same matter.[10] This memorandum, authored by Greisman himself, was intended for BDO's clients and BDO does not claim that it is privileged.

BDO denies that Greisman sent the Kerekes Memorandum to Guerin. BDO relies on Greisman's affidavit, in which he states that "I do not recall or believe I sent a copy of [the Kerekes Memorandum] to Ms. Guerin or anyone else at Jenkens &

3. *Miron v. BDO Seidman, L.L.P.*, No. 04 Civ. 968, 2004 U.S.Dist. LEXIS 22101 (E.D.Pa. Oct. 20, 2004).

4. *See id.* In a separate proceeding, in which the IRS is seeking to enforce summonses against BDO, Judge James Holderman of the Northern District of Illinois permitted BDO to withhold the memo as privileged. *See United States v. BDO Seidman, L.L.P.*, No. 02 C 4482, 2004 WL 1470034, *3 (N.D.Ill. June 29, 2004). It appears that Judge Holderman was not informed that BDO had disclosed the Kerekes Memorandum to Jenkens, and that through Jenkens the memo had already been produced to the government and to plaintiffs' counsel.

5. *See* Affidavit of Michael Kerekes, Ex. C to Affidavit of Michael R. Young, defendant's counsel ("Young Aff.").

6. *See* Supplemental Affidavit of Donna Guerin ("Supp. Guerin. Aff."), by Letter to the Court dated November 17, 2004.

7. *See* Affidavit of Donna Guerin ("Guerin Aff."), Ex. 3 to Affidavit of W. Ralph Canada, plaintiffs' counsel, ¶ 5.

8. *See id.*

9. Supp. Guerin Aff. ¶ 5.

10. *See* January 22, 2001 Fax, Ex. 1–B to Guerin Aff.

Gilchrist." [11] Greisman recalls talking to Guerin about the list-keeping requirements of IRS Notice 2000–44, and admits sending the January 22 fax.[12] However, Greisman denies discussing the Kerekes Memorandum with Guerin.[13] BDO argues that the absence of a cover sheet and the disorganization of the pages in Guerin's copy of the memo suggests that its release was accidental. Finally, BDO claims that, on the day Guerin received the fax, "four months after its preparation ... Mr. Greisman was in Los Angeles for a meeting and then on a plane home to Chicago." [14] However, BDO has not offered any alternative explanation of how Jenkens acquired the document.

I find Guerin's testimony credible. Guerin's specific and unequivocal recollections as to the details of her conversations with Greisman are more persuasive than Greisman's failure to recall sending or discussing the memo. Given BDO's decision not to call Greisman as a witness—surely an indication that BDO has little faith in his ability to withstand cross-examination—I base my findings solely on his various affidavits. Those affidavits are not only vague, but contradictory. In his second affidavit, signed on September 12, 2004, and submitted to Judge Joyner in *Miron*, Greisman stated that he had no record or recollection of having sent her the January 22 fax;[15] now, in his third affidavit, submitted for the first time in this proceeding, Greisman admits sending it. Greisman's

failure to recall sending the Kerekes Memorandum therefore carries little weight.

Accordingly, I find that Greisman intentionally faxed the memo to Guerin (or caused it to be faxed to her), on January 19, 2001, "as part of the backup for [Greisman's] argument" with respect to Jenkens' opinion letters, as described above.[16] I also find that Greisman and Guerin discussed the memo and its contents around that time.

## IV. CONCLUSIONS OF LAW

### A. Is The Kerekes Memorandum Privileged?

As a threshold matter, plaintiffs argue that the Kerekes Memorandum is not a privileged attorney-client communication.

The attorney-client privilege "is one of the oldest recognized privileges for confidential communications." [17] The privilege, designed to "encourage full and frank communication between attorneys and their clients," shields from discovery advice given by the attorney as well as communications from the client to the attorney, made in pursuit of or in facilitation of the provision of legal services.[18] "The broad outlines of the attorney-client privilege are clear: '(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently

---

**11.** Third Affidavit of Robert Greisman, attached to BDO's Memorandum of Law in Response to Plaintiffs' Motion for an Evidentiary Determination ("BDO Mem."), ¶ 2.

**12.** *See id.* ¶ 3.

**13.** *See id.* ¶ 4.

**14.** BDO Mem. at 5.

**15.** *See* Second Affidavit of Robert Greisman, Ex. B to Young Aff., ¶ 11.

**16.** Supp. Guerin Aff. ¶ 5.

**17.** *Swidler Berlin v. United States*, 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998).

**18.** *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.' " [19] The party asserting the attorney-client privilege bears the burden of proof.[20]

Two courts have already determined that the Kerekes Memorandum is a privileged attorney-client communication.[21] It is a close question, nonetheless. Although the memo is addressed to BDO's outside counsel, it asks no specific questions of him. The memo ends with a request for "comments or alternative readings," presumably from all recipients, but there is no indication that this generic request is directed at Dreier.[22] Kerekes indicates an intention to seek legal advice from outside counsel when a particular lawyer "returns a week from Monday," but states that "we will need to form our own conclusions on this issue . . . during the coming week." [23] In addition, Kerekes states that "parts" of the memo "reflect discussions with David Dreier," [24] but there is no way to determine from the face of the document which parts this applies to, or whether those discussions involved the provision of legal advice. Further factual development would be required to answer these questions.

Because, as discussed below, I conclude that whatever privilege that might have once attached to the memo has been waived, there is no need to resolve the difficult question of whether the memo is a privileged attorney-client communication.

## B. Waiver by Disclosure to a Third Party

█ It is well-established that the attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the communication to a third party or stranger to the attorney-client relationship.[25] The party claiming the privilege has the burden of showing "that the communications between client and attorney were made in confidence *and have been maintained in confidence.*" [26] It is therefore BDO's burden to show that its privilege was not waived through disclosure to Jenkens.[27]

█ Plaintiffs argue that, assuming the Kerekes Memorandum was a privileged attorney-client communication, the privilege was waived when Greisman faxed it to Guerin. BDO argues in response that Greisman lacked the authority to waive the privilege on behalf of BDO, and that the disclosure of the memo to Jenkens was in any case not a waiver under the common interest doctrine. Neither of BDO's arguments is persuasive.

### i. Greisman's Authority to Waive the Privilege

BDO contends that Greisman lacked the authority to waive BDO's privilege, even if

**19.** *United States v. International Bhd. of Teamsters,* 119 F.3d 210, 214 (2d Cir.1997).

**20.** *See In re Grand Jury Subpoena Dated Dec. 19, 1978,* 599 F.2d 504, 510 (2d Cir.1979).

**21.** *See BDO Seidman,* 2004 WL 1470034 at *3; *Miron,* 2004 U.S. Dist. LEXIS 22101 at *2.

**22.** Kerekes Memorandum at 7.

**23.** *Id.* at 5.

**24.** *Id.* at 1.

**25.** *See In re Grand Jury Proceedings,* No. M–11–189, 2001 WL 1167497, at *7 (S.D.N.Y. Oct. 3, 2001).

**26.** *In re Horowitz,* 482 F.2d 72, 81–82 (2d Cir.1973) (emphasis added).

**27.** *See id. See also International Bhd. of Teamsters,* 119 F.3d at 214 (listing elements of privilege).

he intentionally disclosed the memo. BDO argues that *Commodity Futures Trading Commission v. Weintraub* [28] is controlling here, and that, under *Weintraub*, Greisman, who was a partner of BDO, but not an officer or director, was without authority to waive BDO's privilege.

In *Weintraub*, the Supreme Court "face[d] the [ ] question of which corporate actors are empowered to waive the corporation's privilege." [29] The Court noted that:

> The administration of the attorney-client privilege in the case of corporations ... presents special problems. As an inanimate entity, a corporation must act through agents. A corporation cannot speak directly to its lawyers. Similarly, it cannot directly waive the privilege when disclosure is in its best interest. Each of these actions must necessarily be undertaken by individuals empowered to act on behalf of the corporation. [30]

The Court went on to state that "the parties agree that the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." [31] Despite this statement, *Weintraub* did not expressly limit the power to waive the corporation's privilege to its officers and directors. Indeed, the holding of *Weintraub* was that a trustee for a bankrupt corporation also has the authority to waive the corporation's privilege, even with respect to pre-bankruptcy communications. [32]

It is far from clear that *Weintraub* has any application to the present case. Greisman was a partner in BDO, not its employee, and " '[w]ell established concepts of partnership doctrine impute the knowledge and actions of one partner to all others.' " [33] Under basic principles of partnership law, Greisman's decision to disclose the memo to Guerin must be imputed to BDO. BDO has identified no authority questioning the power of a partner who is not an officer or director to waive a partnership's privilege. [34] In any case, even

---

**28.** 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985).

**29.** *Id.* at 348, 105 S.Ct. 1986.

**30.** *Id.*

**31.** *Id.*

**32.** *See id.*

**33.** *NLRB v. Broad Street Hospital & Medical Center,* 452 F.2d 302, 304 n. 1 (3d Cir.1971) (quoting *Friend v. H.A. Friend & Co.,* 416 F.2d 526, 533 (9th Cir.1969)). *See also Mallis v. Bankers Trust Co.,* 717 F.2d 683, 689 n. 9 (2d Cir.1983) ("It is a basic tenet of the law of agency that the knowledge of an agent, or for that matter a partner or joint venturer, is imputed to the principal.").

**34.** *Shaffer v. OhioHealth Corp.,* No. 3AP–102, 2004 WL 35725 (Ohio Ct.App. Jan. 8, 2004), cited by BDO for the proposition that *Wein-* *traub* applies to partnerships, in fact dealt with an alleged waiver by a corporate employee, not a partner. *Shaffer* merely cites *Weintraub* for the proposition that "where a corporation, partnership, or other collective entity is the client, the attorney-client privilege belongs to the company and not to its employees outside of their employment capacity." *Id.* at *4. Other courts have extended *Weintraub's* narrow holding to the partnership context, finding that a trustee for a bankrupt partnership has the authority to waive the partnership's privilege. *See, e.g., United States v. Campbell,* 73 F.3d 44 (5th Cir.1996) (holding that "there is no logical reason to distinguish partnerships from corporations or other legal entities in determining the client a lawyer represents" and that "the rules regarding the attorney-client privilege of corporations are no less instructive when applied to a partnership."); *Meoli v. Am. Med. Serv. of San Diego,* 287 B.R. 808 (S.D.Cal. Jan.9, 2003) (same). These general propositions, however, are not controlling of the question at issue here.

assuming, *arguendo*, that BDO is correct in arguing that *Weintraub* applies in the partnership context, it is clear that Greisman had sufficient authority to waive BDO's privilege.

Few cases have addressed the situation in which a single employee, officer or director of a corporation discloses privileged communications to a third party without the express authorization of the corporation's management.[35] The Eastern District of Virginia, in an opinion that has been widely cited in the secondary sources, held that the privilege may be waived not only by officers and directors, but also by lower-level employees, when, acting on behalf of the corporation, they disclose attorney-client communications to third parties—at least where the corporation authorized the employee's possession of the confidential communication, and the corporation took inadequate steps to prevent the employee disclosing it.[36] This holding is in line with the general rule that "[t]he voluntary disclosure of privileged communications to third parties . . . by the client *or the client's authorized agent* destroys both the communications' confidentiality and the privilege that is premised upon it." [37]

Courts have held, however, that even an officer or director may be without authority to waive the privilege when acting in his or her individual capacity, especially in the face of a board or management decision to the contrary.[38] The Second Circuit has held that when a corporate officer testifies in his individual capacity before a grand jury, he does not, generally speaking, have the power to "waive the corporation's privilege without that entity's consent." [39]

There can be no question here that Greisman had the authority to waive BDO's privilege with regard to the Kerekes Memorandum. Greisman was a partner of BDO. He was a member of BDO's Tax Solutions Opinion Committee, authorized to represent BDO with respect to tax shelters. He was clearly authorized to possess the memo; as a member of the Committee, he was one of the memo's addressees, and in fact the memo credits

---

**35.** *See* Charles A. Wright & Arthur R. Miller, 24 Fed. Prac. & Proc. Evid. § 5487 (2004) (noting that "it is surprising how infrequently [the issue of which employees may waive a corporation's privilege] has been given attention in the case law.").

**36.** *See Jonathan Corp. v. Prime Computer, Inc.*, 114 F.R.D. 693 (E.D.Va.1987) (holding that salesman's disclosure of allegedly privileged memorandum during sales negotiations on behalf of corporation waived corporation's privilege). *See also Moore v. Comm'n of Internal Revenue*, 2004 TNT 221–14 (T.C., Nov. 15, 2004) (holding that limited liability company's privilege was waived by representative's disclosure of documents, with or without explicit authorization; and, alternatively, that privilege was waived when documents were disclosed by employee even if she lacked the authority to make the disclosure, where employee had "ready access" to documents and management took no precautions to prevent her from disclosing them).

**37.** Paul R. Rice, Attorney–Client Privilege in the United States, § 9:27 (2d ed.1999) (emphasis added).

**38.** *See, e.g., Milroy v. Hanson*, 875 F.Supp. 646 (D.Neb.1995) (permitting corporation to assert privilege against director, in director's individual lawsuit against the corporation, and denying director's authority to waive privilege on behalf of corporation).

**39.** *United States v. John Doe (In re Grand Jury Proceedings)*, 219 F.3d 175, 185 (2d Cir.2000). The Second Circuit refused to adopt a *per se* rule as to whether the lone officer's waiver could or could not be imputed to the corporation. Instead, the court set out a "fairness" analysis, focusing in particular on whether the officer's disclosure of privileged material was "a deliberate attempt on the part of the corporation to exculpate itself, as opposed to [the officer's] effort to exculpate himself personally." *See id.* at 185–88.

him with a role in its creation. In sending the memo to Guerin, Greisman was not acting in his individual capacity, but as a representative and agent of BDO, in pursuit of BDO's interests. For these reasons, I conclude that Greisman had the authority to waive BDO's privilege by disclosing the memo to Guerin.

Moreover, the privilege would have been waived even if Greisman did not have the authority to disclose the memo. BDO authorized Greisman's possession of the memo, and authorized Greisman to discuss tax shelters and the list-keeping requirements with Guerin. BDO has made no showing that it took any precautions to prevent Greisman from disclosing the memo to third parties; in fact, the memo is not labelled as either privileged or confidential.

### ii. The Common Interest Doctrine

■ BDO argues that, even if Greisman had the authority to waive BDO's privilege, any disclosure was protected by the common interest doctrine. This argument also is unavailing.

■ "At its core, 'the common interest doctrine applies when multiple persons are represented by the same attorney. In that situation, communications made to the shared attorney to establish a defense strategy remain privileged as to the rest of the world.' "[40] However, the doctrine is not limited to such situations. "[T]he weight of authority is that the common interest doctrine does extend at least to situations 'where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel.' That is, the doctrine applies where parties are represented by separate counsel but engage in a common legal enterprise."[41] Like all privileges, the common interest rule is narrowly construed.[42]

■ The party asserting the common interest rule bears the burden of showing that there was "an agreement, though not necessarily in writing, embodying a cooperative and common enterprise towards an identical legal strategy."[43] "A claim resting on the common interest rule requires a showing that 'the communication in question was given in confidence and that the client reasonably understood it to be so given.' "[44] "Some form of joint strategy is necessary to establish a [joint defense agreement], rather than merely the impression of one side."[45]

BDO's argument fails in several respects. In order to invoke the common interest doctrine, it is not enough merely to show, as the doctrine's name might suggest, that BDO and Jenkens had interests in common. Nor is it sufficient to show that they shared concerns about potential litigation. BDO must show a "cooperative and common enterprise towards an identical legal strategy."[46] That is, BDO must show some agreement, whether formal or informal, written or unwritten, to

---

**40.** *Bank Brussels Lambert v. Credit Lyonnais* (Suisse) S.A., 160 F.R.D. 437, 446 (S.D.N.Y. 1995).

**41.** *Id.* at 447 (quoting *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989)).

**42.** *See United States v. Weissman*, 195 F.3d 96, 100 (2d Cir.1999) ("privileges should be narrowly construed and expansions cautiously extended").

**43.** *Lugosch v. Congel*, 219 F.R.D. 220, 237 (N.D.N.Y.2003).

**44.** *Weissman*, 195 F.3d at 99 (quoting *Schwimmer*, 892 F.2d at 244).

**45.** *Id.* at 100.

**46.** *Lugosch*, 219 F.R.D. at 237.

pursue a joint legal defense. To do so, BDO must show some *meeting of the minds* between the parties. In addition, BDO must show that the particular communication at issue was disclosed in connection with the joint legal defense. BDO has not met either burden. Indeed, BDO maintains that neither Greisman nor BDO intended to send the Kerekes Memorandum to Guerin at all. BDO cannot argue simultaneously that Greisman did not mean to send the memo, or that if Greisman did intentionally send the memo, BDO did not authorize him to do so, *and* that BDO sent the memo in connection with a consciously pursued legal strategy.[47] In the absence of any coherent allegation to the contrary, Guerin's explanation for BDO's disclosure of the memo—that BDO was attempting to persuade Jenkens to harmonize the language of its client letters with that of BDO's, rather than in furtherance of a joint defense—is persuasive.[48]

Moreover, even if BDO could show that BDO believed that it was disclosing the memo in connection with a common legal defense strategy, there has been no showing that *Jenkens* believed that it was engaged in any such joint strategy. Guerin categorically denies any such understanding. The fact that Jenkens produced the memo to the government and to plaintiffs, without invoking the joint defense privilege as to the memo or any other document, is also persuasive evidence that

Jenkens was not aware of any joint defense strategy. Finally, it would still be necessary for BDO to show that the communication was given in confidence, and that BDO made reasonable efforts to protect the privilege. There has been no such showing. Guerin does not recall that Greisman gave her any indication that the memo was privileged; and, as I have noted, nothing on the face of the memo indicates that it is privileged.

### iii. Even If the Disclosure Were Inadvertent, the Privilege Has Been Waived

 Even if I were to accept that the disclosure of the memo was inadvertent— if, say, Greisman or his secretary sent the memo to Guerin under the belief that it was a different document, or misdirected the memo to Guerin while intending to send it to someone else—there would still be no question that the privilege has been waived. I have already credited Guerin's testimony that she discussed the contents of the memo with Greisman in early 2001. Even if Greisman did not intend to send the memo to Guerin, or even if it was not Greisman who sent it, he knew when she discussed it with him that it was in her possession.

This circuit's standard test for inadvertent disclosure was articulated in *Lois Sportswear, USA, Inc. v. Levi Strauss &*

---

47. BDO's argument resembles what Freud dubbed "kettle logic," the counter-logic of jokes, dreams and the unconscious:

 A borrowed a copper kettle from B and after he had returned it was sued by B because the kettle now had a big hole in it which made it unusable. His defense was: "First, I never borrowed a kettle from B at all; secondly, the kettle had a hole in it already when I got it from him; and thirdly, I gave him back the kettle undamaged."
 Sigmund Freud, The Joke and Its Relation to the Unconscious, 51 (Adam Phillips ed.,

Joyce Crick trans., Penguin Books 2003) (1905).

48. In *Miron*, Judge Joyner held that, assuming Greisman sent the memo to Guerin, the disclosure was protected under the common interest rule. Judge Joyner did not have the benefit of Guerin's Supplemental Affidavit, in which, for the first time, she describes the non-litigation related purpose of the disclosure.

Co.[49] In applying the *Lois Sportswear* test, courts look to the following factors:

> the reasonableness of the precautions to prevent inadvertent disclosure, the time taken to rectify the error, the scope of the discovery and the extent of the disclosure. There is, of course, an overreaching issue of fairness and the protection of an appropriate privilege which, of course, must be judged against the care or negligence with which the privilege is guarded.[50]

BDO cannot show that it guarded the privilege with appropriate care. Greisman knew that the memo was in Guerin's possession at least as early as January 2001.[51] He made no effort to demand the memo's return, or even to inform Guerin that the memo was confidential and had been sent in error. Therefore, not only did BDO fail to demand the memo's return in 2001, when it first learned that it had come into Jenkens' possession; BDO *still* did not demand its return three years later, even when it knew that Jenkens was producing documents to the IRS and to plaintiffs.

### iv. Plaintiffs' Motion to Lift the Stay

In an Order dated April 30, 2004, I denied defendants' motion to compel arbitration on the ground that the contracts containing the arbitration clauses were mutually fraudulent.[52] All defendants other than the Jenkens and Cantley defen-

dants filed a notice of appeal, and moved to stay this action pending appeal. In an Order dated June 14, 2004 (the "June 14 Order"), I granted the motion to stay.[53] In that Order I held, as an additional ground for denying the motion to compel arbitration, that the arbitration clauses did not encompass the underlying dispute.[54] Plaintiffs now move to vacate the stay of this action pending appeal, on the basis of the newly-discovered Kerekes Memorandum.

In the June 14 Order, I wrote that "[o]rdinarily, when a party appeals an order denying a motion to compel arbitration, the district court should stay the action pending appeal."[55] Just four months later, the Second Circuit has addressed this very issue. In *Motorola Credit Corp. v. Uzan*,[56] the Second Circuit held that a district court has jurisdiction to proceed with a case despite the pendency of a non-frivolous appeal from an order denying a motion to compel arbitration. The Court "explicitly adopt[ed] the Ninth Circuit's position that further district court proceedings in a case are not 'involved in' the appeal of an order refusing arbitration, and that a district court therefore has jurisdiction to proceed with a case absent a stay from this Court."[57] However, "either the district court or the court of appeals may—but is not required to—stay the proceedings upon determining that the appeal

---

**49.** 104 F.R.D. 103 (S.D.N.Y.1985).

**50.** *Id.* at 105.

**51.** Greisman's knowledge of the disclosure, as noted above, must be imputed to the partnership.

**52.** *See Denney v. Jenkens & Gilchrist*, 340 F.Supp.2d 338, 346–47 (S.D.N.Y.2004).

**53.** *See Denney v. Jenkens & Gilchrist*, 340 F.Supp.2d 348, 353 (S.D.N.Y.2004).

**54.** *See id.* at 351–53.

**55.** *See id.* at 349–50 (citing *In re Winimo Realty Corp.*, 270 B.R. 99, 105 (S.D.N.Y.2001); *Satcom Int'l Group PLC v. Orbcomm Int'l Partners, L.P.*, 55 F.Supp.2d 231, 236 (S.D.N.Y.1999), and *Bradford–Scott Data Corp. v. Physician Computer Network, Inc.*, 128 F.3d 504, 505 (7th Cir.1997)).

**56.** 388 F.3d 39 (2d Cir.2004).

**57.** *Id.* (citing *Britton v. Co-op Banking Group*, 916 F.2d 1405, 1412 (9th Cir.1990)).

presents a substantial question." [58] "This is a proper subject for the exercise of discretion by the trial court." [59]

The Kerekes Memorandum states that "[o]ur engagement letters have been structured not to make clear exactly what services we were providing in return for our fee." [60] This language clearly supports my conclusion that the contracts are mutually fraudulent, and that the arbitration clauses do not cover the disputes. While defendants' appeal still raises a substantial question, in light of the Kerekes Memorandum, the likelihood of success appears somewhat diminished. In view of this new evidence, and the Second Circuit's ruling in *Motorola,* I am no longer persuaded that a stay is necessary or desirable. To prolong the stay would impose substantial and unjustified further delays on what has already been a much-delayed litigation. The balance of the equities now tips in favor of lifting the stay.

## IV. CONCLUSION

For the foregoing reasons, I find that any privilege that may once have attached to the Kerekes Memorandum has been waived by its disclosure to Jenkens. Plaintiffs' motion to lift the stay is granted.

SO ORDERED.

---

**58.** *Id.* (citing *Britton,* 916 F.2d at 1412 & n. 8).

**59.** *Britton,* 916 F.2d at 1412.

**60.** Kerekes Memorandum at 5.